(December 31, 1904.)

## SMALL v. HARRINGTON.

[79 Pac. 461.]

RULE FOR ADMISSION OF EVIDENCE IN EQUITY CASES—NUISANCE IN NAVIGABLE STREAM MAY BE ABATED AT SUIT OF PRIVATE CITIZEN— ACQUITTAL ON CHARGE OF MAINTAINING NUISANCES NO BAR TO CIVIL ACTION—AMENDMENTS TO PLEADINGS DISCRETIONARY—NON-SUIT NOT GRANTED WHEN—SUFFICIENCY OF EVIDENCE TO SUPPORT JUDGMENT.

1. In the trial of equity cases the court is not confined to the strict rules prescribed for the admission of evidence in law cases.

2. An action may be maintained by a private citizen to restrain the construction of a nuisance in the navigable streams of this state, under the provisions of section 3633, Revised Statutes.

3. The trial and acquittal of a party charged with the construction of a nuisance in a navigable stream of this state by a jury in justice's court is no bar to a civil action to restrain the completion of the alleged nuisance.

4. Amendments to pleadings at any stage of the proceedings are largely within the sound discretion of the trial court.

5. A motion for nonsuit should be denied unless the evidence wholly fails to establish a right of recovery.

6. In equity cases the appellate court will examine the evidence with a view to sustain the trial court in its findings and judgment, but will reverse the judgment if the evidence is insufficient to sustain it.

(Syllabus by the court.)

APPEAL from the District Court of Nez Perce County. Honorable Edgar C. Steele, Judge.

Judgment for plaintiff from which and an order overruling a motion for a new trial, defendants appeal. Reversed.

The facts are fully stated in the opinion.

Eugene O'Neill and I. N. Smith, for Appellants.

The legislature of the state, in the absence of congressional action, has control of the navigable streams of the state. (*Woodman v. Kilbourne Mfg. Co.,* 1 Biss. 546; S. C., 30 Fed. Cas. No. 17,978, p. 510.) The legislature of this state having seen fit to authorize the erection of dams and booms in its creeks and rivers with passageways around sufficient and so arranged as to permit timber to pass around, through or over said. dam without unreasonable delay or hindrance has legalized the obstruction complained of in this case, the evidence showing a free passage north of the alleged obstructions ample and sufficient at all stages of water that allows of the passage of rafts or logs in the channel west of the piers—north and northward of defendants' mill. (Idaho Rev. Stats., sec. 835; *Wilson v. Blackbird Creek M. Co.,* 2 Pet. 245, 7 L. ed. 412, decision by Marshall, C. J.; *Pound v. Tuck et al.,* 95 U. S. 459, 24 L. ed. 525; *McKelvey v. Chesapeake etc. Ry.,* 35 W. Va. 516, 14 S. E. 267.) The evidence shows no use made of the waters of Clearwater river either unauthorized, unreasonable or unnecessary. (*Dutton v. Strong,* 1 Black (U. S.), 1, 17 L. ed. 29, 32; *Brown v. Kentfield,* 50 Cal. 129; *Yates v. Milwaukee,* 77 U. S. 497, 19 L. ed. 986.) In the case at bar the defendants' log boom is at the lower end of the slough east of their mill. The navigation of the stream is exclusively, at this point, for timber, rafts and logs. The structures complained of reach the floatable waters of the slough leaving to the north a passageway that is wide, deep and safe whenever the space west, to the north and northwest of defendants' mill, will permit of the passage of the logs. This is a reasonable use of a part of the stream, authorized, and the alleged obstructions necessary appliances for using the stream. (*Stevens' Point Boom Co. v. Reilly,* 46 Wis. 237, 49 N. W. 978, 979; *Mississippi etc. Boom Co. v. Patterson,* 98 U. S. 403, 25 L. ed. 206, 208; *Attorney General ex rel. Benjamin v. Manitee River Imp. Co.,* 42 Mich. 628, 4 N. W. 483,

486; *Attorney General v. Evart Booming Co.*, 34 Mich. 461, 475.) To entitle a private individual to maintain the action he must show special injury and must show that the obstruction was unreasonable. (Farnham on Waters and Water Rights, p. 430; *Attorney General v. Stevens*, 1 N. J. Eq. 369, 22 Am. Dec. 526; *Esson v. Wattier*, 25 Or. 7, 34 Pac. 756, 758.) What the state authorizes it cannot prosecute as a nuisance. (*Chope v. Detroit etc. Plank Road*, 37 Mich. 195, 198, 26 Am. Rep. 512; *Watts v. Norfolk etc. R. Co.*, 39 W. Va. 196, 45 Am. St. Rep. 894, 19 S. E. 521, 23 L. R. A. 674.) Reasonable use is the touchstone for determining the rights of the respective parties. The products of the forest would be of little value if the riparian proprietors have no right to raise the water by dams and erect mills for the manufacture of those products into lumber. (*Gaston v. Mace*, 33 W. Va. 14, 25 Am. St. Rep. 848, 10 S. E. 63, 64, 5 L. R. A. 392; *Lancey v. Clifford*, 54 Me. 487, 92 Am. Dec. 561; Farnham on Waters and Water Rights, 425; *Pratt v. Brown*, 106 Mich. 628, 64 N. W. 583.)

M̔cFarland & McFarland, for Respondents.

Anything which is injurious to health or is indecent or offensive to the senses or an obstruction to the free use of property so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, stream, canal, or basin or any public park, square, street or highway is a nuisance. (Idaho Rev. Stats., sec. 3620.) The nuisance complained of in this case is both public and private. (Idaho, Rev. Stats. secs. 3620-3622; *Yolo Co v. City of Sacramento*, 36 Cal. 193.) A private person may maintain an action for a public nuisance if it is specially injurious to himself, but not otherwise. (Idaho Rev. Stats., secs. 3633, 4529; *Redway v. Moore*, 3 Idaho, 312, 29 Pac. 104; *Dawson v. McMillan*, 34 Wash. 269, 75 Pac. 807; *Crescent Mill & Trans. Co. v. Hayes* (Cal.), 8 Pac. 692; *Shirley v. Bishop*, 67 Cal. 543, 8 Pac. 82; *Hallock v. Suitor*, 37 Or. 9, 60 Pac. 384; *Haines v. Hall*, 17 Or. 165, 20 Pac. 831, 3 L. R. A. 609.) Courts of equity will not be reversed because of the admission of incompetent or imma-

terial testimony, for the reason that the presumption is that the court in arriving at its decision considered material and competent testimony only. (*King v. Pony G. Min. Co.*, 28 Mont. 74, 72 Pac. 309; *Tague v. John Caplice Co.*, 28 Mont. 51, 72 Pac. 297; *Metcalf v. Bockoven* (Neb.), 96 N. W. 406.)

STOCKSLAGER, J.—On the twentieth day of March, 1903, respondents in this action filed a complaint in the district court of Nez Perce county against the appellants, setting out facts which, in the opinion of the district judge, warranted the issue of an injunction restraining certain acts until the further order of the court. Thereafter, and on the twenty-seventh day of March following, plaintiffs filed an amended complaint. The first paragraph alleges that plaintiffs are copartners, doing business at Lewiston, Idaho, under the firm name and style of Small & Emery and that they are engaged in the manufacture, wholesale and retail, of lumber, shingles, etc. Second: That since the twentieth day of August, 1896, plaintiffs have been in the active possession of and operating a sawmill, situated on the south shore of the Clearwater river at Lewiston, and that plaintiffs have operated said mill and are operating it for the purpose of manufacturing lumber and building material for wholesale and retail trade. That ever since said last mentioned dates plaintiffs have owned large quantities of logs on and along said river about eighty miles above plaintiffs' said sawmill; that all logs sawed or manufactured into lumber at said mill have been procured on and along said river and its tributaries at points all the way from forty-five to eighty miles above the site of said mill. That the only means of transportation of logs to said mill is by floating them down said river in rafts or drives.

The third allegation is that the Clearwater river is a navigable stream and that the plaintiffs and the public generally from time immemorial have used the same for the purpose of driving and floating logs, rafts, etc., down the same; that it is usual every spring between the 10th of February and the 1st of July for said stream to rise, caused by the melting snow in the mountains. That it is impracticable and impossible to drive

or float rafts or drives of sawlogs from any point fifty miles above the site of said mill down said river only during the rise thereof. That plaintiffs have purchased and contracted about two million feet of logs to be floated down said stream and delivered at their said sawmill as soon as they can be delivered. That said timber last above mentioned is situated about fifty miles above said sawmill; that plaintiffs have purchased, and are now purchasing, divers other large quantities of sawlogs which they intend to float down said river when the spring rise comes. That defendants are operating, or claim to be operating a sawmill on the south shore of said Clearwater river about one-fourth mile above the site of plaintiff's sawmill; that there is in said Clearwater river a certain island which commences at a point about a quarter of a mile above the sawmill of defendants and extends down said river to a point a short distance below the sawmill of plaintiffs. That the upper point of said island is very narrow for some distance, but that going down said river it gradually widens until it is about four hundred feet wide; that said upper point is about one hundred and fifty feet from the south shore of said river at and near the site of defendants' sawmill; that the current of said river is divided at the upper point of said island, one part of said current or channel running and flowing along the south shore of said river and the other part of said current or channel flowing on the north side of said island; that in driving and floating rafts and drives of said logs and timbers down said river to the site of defendants' said mill it is necessary that said sawlogs be floated in the channel or current on the south side of said island; that if said logs are permitted to get on the north side of said island, or in the current or channel on the north side of said island, they are carried down said Clearwater river beyond the site of plaintiff's mill and into Snake river and become unmanageable and lost; that said defendants are proceeding to build, and are wrongfully and unlawfully building, a series of piers composed of large and divers quantities of piles of rock, stone and timber in said Clearwater river diagonally across the said south channel of said river from the site of defendants' said mill to the point of said island where said

current or channel is divided by the point of said island, and give out and threaten that they will build and complete the said series of piers diagonally across said river in an upper direction to a point where said current or channel is divided and obstruct the passage of said south channel; that if said piers are completed and extended by defendants as aforesaid, said channel will be obstructed and it will be impossible to pass any raft or drive of logs or other crafts or deliver any logs brought down said river at the site of plaintiffs' sawmill; that the building of said piers will obstruct the free passage and use of said channel, and the public generally will be prevented from freely using the same. That by reason of the plaintiffs being prevented from the use of said channel by the construction of said piers they will suffer great and irreparable damage and injury; that when said plaintiffs come to float their said logs down said channel the said piers will cause said logs to be stranded thereon or will turn said logs into the north channel and cause them to be carried beyond plaintiff's mill and into Snake river, and thereby cause the plaintiffs to lose the same and cause plaintiffs great damage in the sum of at least $12,000. That defendants will continue to construct the said piers unless restrained by the court; that they have already built seven piers in and across said channel or current as aforesaid; that said piers are at least twelve feet wide, and one of them at least one hundred feet long, and that all of said piers average about five feet in height—that is to say, five feet above the surface of the water, and if said piers are completed said channel will be completely obstructed and it will be impossible to float or drive logs through the same.

The fourth allegation is that the Clearwater river at the point where the piers are being built is, and ever has been, navigable, and said south channel is, and ever has been, navigable, and that the public has used the same for passing, floating and driving rafts and drives of logs and other crafts down from time immemorial, and plaintiffs have used the same for said purposes ever since they first established their sawmill; that said south channel is the only way or means by which plaintiffs can transport, convey or deliver logs at their said sawmill. That

at all times mentioned plaintiffs and the public have had the right to use said channel, and that neither of said defendants have any right to obstruct the free passage of the same.

The fifth alleges the insolvency of defendants, and inability to respond in damages, and further alleges that defendants established their said mill and began the use of said south channel long subsequent to the time that plaintiffs began the operation of said mill and commenced the use of said Clearwater river, and further alleges that said defendants have committed a public nuisance by reason of their acts aforesaid.

Then follows prayer for injunction, restraining defendants from building, constructing, completing or continuing the said piers or otherwise obstructing the free passage or use of said river, and particularly the south channel or current thereof. That on final hearing the injunction be made perpetual. That the said nuisance be abated and that plaintiffs have their costs.

Defendants answering admit paragraph 1 of the complaint. Paragraph 2 is denied for the want of information and belief sufficient to enable them to answer.

Answering paragraph 3, defendants admit that the Clearwater river at the time herein mentioned is a navigable stream at a certain season of the year. Deny that it is practicably navigable except during high water in said stream, and admit that plaintiffs and the public generally have during the past ten years, but not from time immemorial, used for floating logs, rafts, timber, etc., down the same during the high water, and admit that it is usual during late spring and early summer, to wit, during the last days of May and the month of June, for the Clearwater to rise; but deny that it is usual for said river to rise or be at the stage of high water at any other season of the year. Admit that said rise is caused by melting snow. Admit that it is impracticable and impossible to float rafts, etc., from any point fifty miles above the site of said sawmill, only during high water. As to allegation that plaintiffs have contracted for about two million feet of said logs to be floated down said river to said mill, and have purchased and are purchasing other large quantities of sawlogs to be floated down said river to said mill when said spring rise comes, these de-

fendants have no information or belief upon the subject sufficient to enable them to answer that allegation, and therefore deny the same and place their denial on that ground. Admit that defendants are actually operating a sawmill on the south shore of the Clearwater river about one-fourth mile above the site of plaintiffs' mill. Deny that there is in said river any island which commences at a point about one-fourth mile above the sawmill of defendants or extends down said river to the point a short distance below the sawmill of defendants. Aver the fact to be that there is, except in high water, a strip of land or sandbar commencing nearly opposite in the Clearwater river of the plaintiff's said sawmill and extending between the slough and channel of the Clearwater river westerly, but admit that in extreme low water the said line of land extends to a point far above the site of defendants' mill, and that in extreme low stages of water that the upper portion of said strip is simply riffles of water flowing slowly over gravel on said bar. Deny that said alleged island at its upper point is very narrow for some distance; deny that it widens to the width of four hundred feet at ordinary stages of water at its lower end, or any other or greater width than two hundred feet at ordinary stages of water. Deny that said upper point is only about one hundred and fifty feet from the south shore of said river at or near defendants' sawmill, but aver the fact to be that the said strip of land and said bar are about two hundred feet to the north of the south shore line at high water of said river at and near the site of defendants' mill. Deny that the current or channel of said river is divided at the upper point of the so-called island; or that there is any island other than stated in this answer, and deny all the allegations of plaintiffs' complaint with reference to the necessity for the use of what is known as the south channel to land logs at plaintiffs' mill, or that the piers will cause the logs, rafts, etc., to pass plaintiffs' mill and be carried into Snake river as alleged in the complaint. Deny all that part of the complaint that alleges that defendants are constructing piers diagonally, or otherwise, across said south channel of Clearwater river, or at all, as alleged in the complaint, or that the building of the piers will in any manner interfere with the

plaintiffs or cause them any damage whatever. Deny that if defendants are not restrained by an injunctional order of the court they will continue to construct or build said piers, but aver the fact to be that all of defendants' piers were built, constructed and completed prior to the time of plaintiffs' filing their original complaint, or any complaint in the cause, and deny that the defendants have made any threats; deny that by said piers they have obstructed the free passage or use of said river. Deny that the defendants are now proceeding to wrongfully or unlawfully build or complete said series of piers, but aver that all piers are long since completed that have been or are to be built by defendants during the present season. Admit that they have built during the present season five piers, and no more, but deny that they are in or across the said south channel or current of said river. Deny that said piers are at least twelve feet wide, but aver that said piers built the present season are six by ten feet and admit that one of the piers is about one hundred feet long; deny that said piers average five feet in height and that they extend five feet or any more than three feet above the surface of the water at low water.

The fourth denies all the allegations in paragraph 4 of the complaint.

The fifth denies all the allegations in paragraph 5 of the complaint.

For second and fourth defense to the complaint defendants allege: First, that the defendants are partners in the said mill business at Lewiston, Idaho; the second averment is that defendants are the owners of the land upon which their mill is located, describing it. Third describes a tract of land to the west of the tract upon which their mill is located alleged to have been purchased by Starr W. Scofield of William Phillips, and that the slip or channel on which is held the logs or timber to be sawed in said mill, and for securing and holding the same in place, is situated the piers, five in number, together with the slip or boom piers and the terminal piers. Fourth avers that said slip and piers are all at the western terminus of the slough upon the Clearwater river, and the same has been largely improved and placed in its present condition by open-

ing the said slough and extending the same to the mill of defendants, so that the slip and piers serve the purpose of receiving and holding not to exceed one hundred thousand feet of logs for the use of defendants' mill, the capacity of which is thirty to forty thousand feet of said lumber in ten hours, and without which said slips and piers the milling operations of defendants cannot be successfully conducted, and the same are in no way an obstruction to the free use and navigation of the Clearwater river, and are entirely within and upon land conveyed by the United States government to the predecessors of defendants, and the said slips or piers and the use made of them are in no way unreasonable or improper uses of the said river as a navigable stream. Fourth, that said portion of ground upon which is situated said mill of defendants, and the slips and piers of defendants have been used for milling and logging and log-holding purposes by the defendants and predecessors in the sawmill business for over a period of twenty years as defendants are informed and believe, and so allege. The previous slips, booms and piers of the predecessors of these defendants extending further beyond and causing more space than those of defendants', and neither the slips, booms or piers of these defendants or their predecessors have been, or now are, an unreasonable use of any portion of the Clearwater river or in any way a nuisance on or along the border of said river, but is a suitable and proper use of the defendants and their predecessors' own property adjoining and abutting upon a navigable stream.

For a third and separate defense defendants plead a trial in the court of Samuel L. Thompson, a justice of the peace of West Lewiston precinct, wherein they were charged with willfully and unlawfully obstructing the free passage and use of the Clearwater river, which was a navigable stream, by floating in said river the obstructions complained of in this action. That a trial was had in said justice's court, with a jury, and they were acquitted of said charge, and that it is a bar to this action.

On May 8th, defendants, by leave of court, filed an amendment to their amended complaint, amending paragraph 2 of said amended complaint, by alleging that ever since the twen-

tieth day of August, 1896, plaintiffs have been the owners entitled to and in the active possession of and operating a certain sawmill thereupon described, and now are entitled to the exclusive possession of the lands and premises upon which said sawmill plant is situated as the lessees thereof, etc. The remainder of the allegation is covered by other allegations of the complaint.

We have set out very fully the substance of the pleadings in this case in order that the true situation may be fully understood.

The case was tried without a jury, and on the nineteenth day of June, 1903, the court filed findings of fact, conclusions of law and decree, which were in favor of the plaintiffs. The language of the decree is that the temporary restraining order heretofore issued and served upon defendants herein be, and the same is hereby, made absolute and perpetual, and it is hereby further ordered, adjudged and decreed that the said defendants—naming them—their agents, servants, employees and all others acting under them be, and they are hereby, perpetually enjoined and restrained from in any manner building, erecting, constructing or completing piers in or across the south channel of the Clearwater river from the site of defendant's sawmill on the south shore of said Clearwater river in the city of Lewiston to the island in said river, or at any other place in or across said south channel above the sawmill site of Small & Emery, or in building or placing any other piers in or across said south channel at the point of said piers, or in otherwise obstructing the free passage or use in the customary manner of said south shore of said Clearwater river. Judgment was entered for costs on the twenty-fourth day of June, 1903, and defendants filed their motion for a new trial alleging: 1. Insufficiency of the evidence to justify the decision of the court and that the decision is against law; 2. Errors of law occurring on the trial and excepted to by the defendants' said motion will be made upon bills of exception and a statement of the case. On the seventh day of December, 1903, the motion for a new trial was denied. The appeal is from the judgment and the order overruling the motion for a new trial.

It seems this case had a stormy career from the time the motion for a new trial was filed until the statement was settled. The record, from page 50 to and including part of page 92, is consumed with motions and affidavits in opposition to such settlement which are met by counter-affidavits of appellants in an effort to justify any laches that are urged by respondent. It is sufficient to say that the court did settle the statement on the seventh day of December, 1903, and we are disposed to accept his conclusions.

Many of the assignments of error are based upon the ruling of the court in the admission or rejection of evidence. In the trial of equity cases the rule seems to be that courts are very liberal in the admission of evidence, the theory being that in the final determination of the action, only such evidence as is competent and pertinent to the issues will be considered. We are aware that this rule is subject to abuse and if carried too far might work a great hardship and injury to either party to the litigation.

We have considered the errors assigned on this ground in the case at bar and do not feel inclined to hold that any evidence was admitted that was misleading or calculated to misdirect the court on the material issues involved. If it were made to appear by the record that the court based any material finding or conclusion on evidence that should have been excluded as not being relevant to the issues, or for any other reason, then we would not feel inclined to hold that the court could admit any and all kinds of evidence and be justified under the liberal rule above suggested.

For recent discussions of this question, see *King v. Pony Gold Min. Co. et al.*, 28 Mont. 74, 72 Pac. 309; *Metcalf et al. v. Bockoven* (Neb.), 96 N. W. 406.

Counsel for appellants urge that if they have created a nuisance at the place and in the manner named, the plaintiffs cannot be heard to complain as private citizens. That if a nuisance is to be removed from a navigable stream of the state, it must be at the instance of the attorney general on behalf of the state.

Section 3633, Revised Statutes of this state, provides that "A private person may maintain an action for a public nuisance if it is specially injurious to himself, but not otherwise." This section of our statute has been construed by this court in *Redway et al. v. Moore,* 3 Idaho, 312, 29 Pac. 104. In construing this section the court, speaking through its chief justice (Sullivan), said: "Under the provisions of that section a private person may have his action to abate or restrain the continuance of a public nuisance provided he alleges and shows that such nuisance is specially injurious to himself; see authorities cited." We think this a correct construction of the statute, and further, that the parties brought themselves within its terms in this complaint. They allege special damage to themselves by reason of the obstruction of the south channel of the Clearwater river, and state in plain and concise language the reasons why their damage is different from that of the general public; whether they were able to establish this allegation or not has nothing to do with the pleading.

Counsel for appellants also urge with much enthusiasm and ability that the court erred in not permitting the appellants to show that the defendants, or some of them, had been arrested on a criminal complaint and tried in a justice court of one of the precincts of the city of Lewiston on the charge of maintaining a public nuisance involving the identical question involved in this case; that the case was tried by a jury duly and properly selected, and that after a full and fair investigation defendants were acquitted; that said judgment is a bar to this action. We do not think the court erred in this ruling. The mere fact that the jury did not convict defendants of maintaining a nuisance is no bar to a civil action to require defendants to abate the nuisance, and this is especially true where it is shown that neither of the plaintiffs was the complainant in the criminal action. If the contention of counsel for appellant is to be upheld, it is equivalent to saying that an acquittal of a charge of grand larceny by a jury regularly selected would be a bar to the recovery of the property alleged to have been stolen in an action of claim and delivery.

It is next urged that the piers were completed before the re-straining order was served upon the defendants, and for that reason the order was improperly issued and should have been annulled by the court when that fact was established. If the work was completed as contemplated by the defendants at the time the restraining order was served it could serve no purpose derogatory to the rights or interests of the defendants and was entirely harmless so far as they were concerned. We find no order requiring the defendants to remove any obstruction placed in the Clearwater river; neither does the decree require the de-fendants to remove the obstructions already placed in said stream, only to desist from completing the work of the alleged obstruction.

The serious and all-important question before us for deter-mination, and the one we approach with much delicacy, is: Was the evidence sufficient to support the judgment? Whilst the rule in equity cases as enunciated by the courts generally, and this court repeatedly, is not as stringent as in law cases, it is the policy of the appellate courts to sustain the judgment of the trial courts when it can be done without apparent in-fringement of the rights of litigants. The learned judge be-fore whom the respective rights of the parties to this action were submitted, found for the plaintiffs, rendered a decree ac-cordingly, and afterward refused to grant defendants a new trial.

It is shown that this litigation is between rival mill owners on what is termed the south channel of the Clearwater river as it flows by the city of Lewiston. No one else has any inter-est in the result of the litigation so far as the record shows. Before the plaintiffs were entitled to a restraining order, such as was issued on the final determination of this action, and judgment rendered, it was necessary for them to establish by a fair preponderance of the evidence that the use made of said stream by appellants was unauthorized, unreasonable or un-necessary. Albert Small was the first witness who testified for plaintiffs. After testifying to the partnership and business of himself and company, plaintiffs, that they were the owners of the sawmill and had been at its present site for the past six

years, and that they rent the millsite from Volmer & Scott, that the Harrington & Parkyn mill is on the south shore about one-fourth of a mile above the Small & Emery mill, says both mills are situated on the south bank of the south channel of the Clearwater river.

Fred W. Emery testifies as to a conversation with defendants two or three days before the injunction was issued or filed. As he states it, they had a gang of men constructing piers; they had several of them. The bottom of the piers laid out and built part way up, and I talked with them with regard to leaving an opening to get through. We could not get through them. The piers were built of rock and timber and cribbed up with timber and filled with rocks; one was one hundred feet long, probably twelve feet wide; I took it to be about five feet above low water. The other piers looked to me to be built somewhere at the bottom about ten or twelve feet long and six or eight feet high. There were five that I counted at that time, piers, in the course of construction; the one hundred foot pier was completed. The one at the outer end of the island probably ten or twelve feet square—these piers extended one hundred to one hundred and fifty feet from the bank out to the point where the channel was cut or parted by the island. The outer pier extended out where it was all out of water in low water. The old raft channel runs through where this long pier is. Right by the corner of the mill there is the deepest water. There was no way of rafting logs through these piers as they were being constructed when the water was down. The only way was to cut the raft to pieces and shove them through a log at a time.

Albert Small testified to seeing parties at work about the 12th of April, 1903, constructing piers, their manner of construction, etc. Emery and Small both testified that there was no other means of getting their logs along the Clearwater down to their mill except by rafting and driving them down the Clearwater river. Emery says during the spring rise logs cannot be taken down the north channel of the river and landed at their mill. The way the mill is situated the island runs down at the north of the mill, and if we come down the north

channel we pass our mill before we get to the foot of the island and could not get a raft in if we tried. During the spring rise if rafts or drives are not landed at our mill they go into Snake river. These piers extend from defendants' mill diagonally upstream across the south channel to where the current of the river is divided. Small says: "The piers stop navigation practically with anything but a small boat or any small conveyance. It is not possible to take a raft of logs and land it at our millsite by going to the north of these piers."

Charles Adams testified: "I have been running logs and rafts on the Clearwater river ever since four years before 1877. In coming down the Clearwater river we would have to go down the south side of the channel all the time to reach the Small & Emery mill. You could not take a raft around that east pier—that is, north of it—and then land it at Small & Emery's mill because it would take us on the main river; danger of coming into the Snake, certainly lose the raft."

George White testified that there is no other way to get a raft to Lewiston other than bringing it down the south channel of the Clearwater river.

James C. Evans testified: "I used this south channel in bringing these rafts down and landing them at the Small & Emery mill. That was the usual way to bring logs down. I saw the piers that were being put in the south channel along in April. I saw them before any of them were broken or washed out. Well, I think they stopped the running of rafts. You could not run rafts through them. I do not think a person bringing a raft down the Clearwater river could get north of the piers and land at Small & Emery's mill. A draught of water would take him beyond the bar or into the main river. It would take him down the Snake below Small & Emery's mill."

Captain Ephriam W. Baughman testified: "I know where the sawmill of Small & Emery is situated. I hardly think it would be possible to bring logs and rafts of logs down the Clearwater river and land them at the sawmill of Small & Emery without bringing them through the south channel. That is my idea; it couldn't be possible. If you miss the south channel I do not think you could stop it. I am sure you could not

unless you had a very strong line to get in around the island. I do not think it would be possible to get it in after getting it outside on the north side of the island. It would go down in spite of all they could do with oars or power that could get on the raft."

This is the evidence upon which learned counsel for respondents ask the court to sustain the judgment of the lower court. It is largely copied from their brief, and an examination of the record discloses that it is a fair synopsis of the evidence given by the witnesses on behalf of the plaintiffs. At the close of plaintiffs' evidence defendants moved for a nonsuit on the ground of an objection to the amendment of the complaint, and further that the only injury attempted to be shown in this case is one resulting from an alleged infraction of a common right; and that there is no evidence to show that the defendants have made any unreasonable or imprudent use of their millsite or of their right to construct piers in a navigable stream; that the evidence shows that plaintiffs and defendants both maintain mills and are simply competing companies; that the evidence shows that there is no careless exercise of the public right and no reckless use thereof shown; that an individual cannot maintain an action for the enforcement of a common right such as is attempted to be shown in this case, and that the private appropriation of a portion of a navigable stream is not shown to be a nuisance of which the court will take any notice or knowledge. This motion was overruled, and we think properly so. The filing of the amendment to the complaint was a matter largely within the discretion of the court, and we find no abuse of his discretion. We find no error in overruling the motion for nonsuit on any of the grounds alleged in the motion.

Defendants then called Jacob Sharrah as a witness, who testified that he had resided in Lewiston twenty-one years and his occupation teamster. Knows the location of both sawmills and has hauled lumber and wood for both companies. "I know of logs coming to the Small & Emery millsite soon after I come here. Elliott & Emery I believe brought a drive of logs to this same location where their mill now is, and the drive

was all brought together, I think, with Mr. Harrington's. I don't think anything about it; I know it. I know Mr. Harrington and Emery & Elliott's drive was brought together in one drive, and right at the point of this island there was a place arranged there to divide the logs. They ran one drive into the slough where they had a boom to hold the logs, and the others they had a boom on the outside of the island. To the north of the island in the main Clearwater river they ran that drive down the Clearwater river to the mouth of the slough, the Emery & Elliott slough, now the Small & Emery mill slough, and backed them into the slough where there was deep water where they had no trouble in holding them. Yes, sir; they came out north of what they designate as the island north of their millsite and went to the west end of the island. Harrington sent his logs down the other slough. He further testifies that Al Smith brought a drive of logs to the Emery & Small mill and they were handled in the same way. Asked if there was any trouble in bringing logs down that way, said there is no trouble at the same time of the year they were brought down there. It was in low water brought down generally from September to February and March before the water began to rise much. I am pretty certain it was in September when Mr. Smith brought his logs down on the north side of the island. It was twenty years ago this summer that Smith brought his logs down. When I first came here there was no passageway between these mills for the floating of logs. No water ran through there at all. To the best of my recollection there has not been any water run through that slough until about four or five years ago since I have been here—that is, at low-water mark."

E. G. Cummings testified as to the accuracy of the pictures marked as defendants' exhibits.

J. D. Seibert testified that he was engaged in logging and rafting on the Clearwater river, and has been so engaged three or four years; acts as pilot on rafts; thinks he is familiar with the channel and currents of the river; knows the situation of both mills; familiar with the channel and currents between those mills; has noticed some piers east of the Harrington &

Parkyn mill. After describing the piers—has run rafts over
that ground to the east of the Harrington & Parkyn mill be-
tween the waterworks or pumping-plant station and these mills.
"Well, with the piers there it would be the proper plan to go
around outside of it to the north side of it. To the north of
these piers is a suitable and proper passageway for rafts at a
rafting stage of water to get into the Small & Emery mill; a
man can get in there. About two feet is the average rise in
water to enable the average raftsman to come down the river.
At two feet of water I don't think you can safely pass to the
north of the piers with a raft and go into the Small & Emery
slough; stick on the bar below. No trouble in getting by these
piers at that stage. I don't think so. That shallow piece of
water you would get stuck on or have trouble with is almost
north and northwest of the Harrington & Parkyn mill, and
even in the mouth of the slough that leads to the Small &
Emery sawmill down below the Harrington mill. I have no-
ticed the stage of the water yesterday; not to-day. You could
keep outside of those piers at that stage of the water to the
north and go into the Small & Emery slough. At still higher
stages, the higher the water the better to keep outside of the
piers. You couldn't get into the channel on the north side;
the north side channel it would be impossible. With a low
stage of water you couldn't get into the north channel. I ran
twenty-two rafts down the last year on the Clearwater. I don't
remember how many the year before—nine or ten. I am en-
gaged in that business all the time when there is a rafting stage
of water."

J. T. Hamm testified that he helped to construct a portion
of those piers. "I think my first time there to take any notice
of the piers was about the 24th of December last. I know of
rafts being passed down by the Harrington & Parkyn sawmill.
Since that time on the 4th of April, 1903, there was a raft
went on the north of it run down. It was a raft that Small
& Emery bought above, and they run it on the north side of
the pier. Mr. Emery was there with another raft that came
in prior to this, and they were cutting those logs loose and these
gentlemen wanted to sell them this other raft and went down

and spoke to Emery and says, 'I will sell you the raft, but we want to take it on the outside of the piers.' Mr. Parkyn said that. He spoke to Emery and said, 'We want you to buy this raft of course, but understand, we want to make a test of this to see whether the raft can be run on the outside on this point, outside the piers, and that Harrington & Parkyn's responsibility is behind this raft if it is lost and we will take it around.' However, there was no definite answer made in regard to that, and we started up to the raft. 'Now,' says Mr. Parkyn, 'you say that that can't be run around there—he said this to Emery—I think it can, and we will make a test case of it.' Mr. Parkyn and the man that had the raft started down the river to run around the piers, and they come down all right and tied up the raft." On cross-examination said he was an employee of the defendants.

George A. Frost testified he had resided in Lewiston thirty-two years and gave a description of the river in its various changes since that time. What is termed the south channel is not as it was when he first knew it. Followed boating, logging and rafting on the Clearwater a number of years. Has taken rafts to the site of Small & Emery's mill, through what is called the north channel, but conditions have changed since the construction of the two mills and does not enlighten the court very much.

J. O. Maxon, recalled for defendants, testified: Was engaged in rafting from 1873 to 1881 on the Clearwater; knows the present condition of the channels at Lewiston and the situation of the piers. "The east pier stands just barely on the edge of the water in low water, as far as my remembrance serves me. From my experience as a raftsman I would say as to the taking of rafts north of the east pier and landing at Small & Emery's mill as the river now is at the present stage of water, it can be done easily. It can be done at a reasonable rafting stage."

Jacob Taylor testified he had been engaged in logging on the Clearwater seven years; is a pilot; ran twenty-eight rafts last year; is familiar with the rafting business; is familiar with the water between the power-house to the mouth of the slough

below the Small & Emery mill; knows where the piers are lo-
cated. "Low water permits the running of rafts between the
power-house and the Small & Emery mill, and what we rafts-
men call low-water running stage. Whenever the upper river
is so we can clearly run rafts with safety we can't go through
the slough. The obstruction comes with reference to going
through the slough at such stage just below the Harrington &
Parkyn mill between that and Emery's mill. To pass between
the power-house and the Small & Emery slough, we have to
have, I should judge, anyhow four feet above low water up in
the main river, and with four feet of water above low-water
mark I can pass to the north of the piers of the Harrington &
Parkyn mill with safety and easily. I consider it a suitable
and proper passageway for rafts coming through from the
power-house to Small & Emery's slough or mill. I would con-
sider that I could run a raft around to the north of the piers
at any time. I can run a raft on the river and go to this
mill—Small & Emery's mill. I was on the river about the
28th of March with a raft at the power-house. Mr. Emery
got the raft. We stopped the raft at the landing with a rope,
and Fred Emery told me to take the raft on down and run
it on to Parkyn's piers and stop it there. Well, I didn't want
to go down on the piers because I didn't want to knock those
piers out— He said Benson is about there and we want to get
that down, and I run the raft down and let the piers stop the
raft. The raft knocked one pier over and lodged against an-
other one and stopped." William Benson testified that he was
a raftsman and knew the river from the power-house to Small
& Emery's mill. Somewhere about the 13th or 14th of April
he took a raft of telephone poles from the power-house north of
the piers and landed it just above Small & Emery's mill. It
was a hard raft to handle. Water was low at the time.

C. E. Stebbins testified that he helped to construct the piers;
thinks it is about two hundred feet from the piers to the north
of the bar. When we built the east pier there was about
eighteen inches of water around it. The water got deeper out
from the pier.

William W. McCort testified he assisted in the construction of
the piers.

Frank Parkyn testified as to the construction of the piers, that it is possible to take a raft north of the piers. There is never a raft nearly so wide as the deep water north of the piers; there is never any rafts wide enough to fill the space available. Took a raft bought of Thomas by Emery past the piers, and landed it at Small & Emery's mill. Testified that he had tested the channel by dropping chunks and sticks in the channel north of the piers, and that they did not go to the north channel of the river.

Some witnesses were called in rebuttal, but in our view of the case it was on unimportant, immaterial issues, except the evidence of Mr. F. W. Emery, who testified with reference to the raft taken by the piers by Mr. Parkyn. He called it a "little skate of a raft," and said he did not see it go by the piers.

Applying the law as we understand it to the facts in this case, we do not think this judgment can be sustained. The legislature in providing for the construction of dams and booms in the rivers and creeks of the state, in section 835, Revised Statutes, says: "No dam or boom must be hereafter constructed or permitted on any creek or river unless said dam or boom has connected therewith a sluiceway, lock or fixture sufficient and so arranged as to permit timber to pass around, through or over said dam or boom without unreasonable delay or hindrance." It will be observed that the legislature by that section has provided for the use of the streams of the state for logging purposes, and has provided such safeguards as will best protect all concerned. By the terms of this section of our statute, there can be no question of the right of appellants to construct the piers complained of if they have so constructed them as to permit others to use the stream without unreasonable delay or hindrance. It seems that only the two mill companies, the appellants and respondents in this action, are using the channel where the piers are constructed, but this fact has nothing to do with the situation. If the piers are not constructed as contemplated by the statute, the judgment should be affirmed. The act of the legislature legalized the construction of the piers with certain restrictions. In *Dutton v. Strong,* 1 Black (U.

S.), 1, 17 L. ed. 29, Mr. Justice Clifford says: "Bridge piers and landing places, as well as wharves and permanent piers, are frequently constructed by the riparian proprietor on the shores of navigable rivers, bays and arms of the sea, and where they conform to the regulations of the state and do not extend below low-water mark, it has never been held that they were a nuisance, unless it appeared they were an obstruction to the paramount right of navigation. Whether a nuisance or not is a question of fact; and where they are confined to the shore, and no positive law or regulation was violated in their erection, the presumption is that they are not an obstruction, and he who alleges the contrary must prove it." (See in *Yates v. Milwaukee,* 77 U. S. 497, 19 L. ed. 986.)

In *Stevens Point Boom Co. v. Rilley,* 46 Wis. 237, 49 N. W. 978, it is said: "The right in question [maintaining a boom] necessarily implies some intrusion into navigable water at peril of obstructing navigation."

In *Attorney General v. Evart Booming Co.,* 34 Mich. 462, the court says: "But like common carriers (boom companies) on the same route, which in a certain sense they are, they must put up with these inconveniences arising from (appropriations of parts of streams) so far as they are not reasonably avoided; they constitute no nuisance, and neither party conducting its business in a proper and prudent manner can be subject to either public or private complaint. Any injury under such management must be considered incidental to and inseparable from the exercise of a general right." (See Farnham on Water and Water Rights, p. 430.)

In *Lancy v. Clifford,* 54 Me. 487, 92 Am. Dec. 561, may be found a very full discussion of this question. Many other authorities are cited by appellants in support of their various contentions, but we do not think it necessary to quote further from them. The rule governing cases of this character is that all parties interested in the free use of a navigable stream are subject to conditions that may exist in each particular case. No one has the right to arbitrarily obstruct a stream to the detriment or injury of his neighbor; each one is entitled to the free and reasonable use of the navigable streams of this state,

and may place such reasonable obstructions on the stream so long as they serve a useful and beneficial purpose and leave a reasonable use to others interested. In this case we cannot say the piers were unreasonable or not necessary for the appellants in the enjoyment of their rights on the stream. If an obstruction merely impairs or renders more difficult the navigation without destroying it, an individual has no rightful cause for complaint, because he has no right to insist on the best possible accommodation. In this case we are not satisfied that in reasonable stages of water rafts cannot be taken to the north of defendants' piers and landed at the Small & Emery mill; indeed, we think the evidence abundantly establishes the fact that such is the case.

It is urged by counsel for appellants that the court neglected to find on all the issues involved. As there is to be a new trial granted, we suggest that the court should find on all the material issues in the case. We have already passed upon all, or nearly all, of the errors assigned, many of them in groups, and some without singling them out. We apprehend the trial court will have no difficulty in the next trial of this case in determining the views of this court.

The judgment is reversed and remanded for further proceedings in harmony with this opinion. Costs awarded to appellants.

Sullivan, C. J., and Ailshie, J., concur.