606 P.2d 958

**Norman F. LINSCOTT and Lillian E. Linscott, husband and wife, Plaintiffs-Respondents,**

**v.**

**RAINIER NATIONAL LIFE INSURANCE COMPANY, Defendant-Appellant.**

**No. 12401.**

Supreme Court of Idaho.

Jan. 9, 1980.

Rehearing Denied March 17, 1980.

---

Jack L. Curtin of Clark, Curtin & Creason, Lewiston, for defendant-appellant.

Joseph J. Ganz of Sharpe, Twigg & Ganz, Spokane, Wash., Thomas A. Mitchell, Coeur d'Alene, for plaintiffs-respondents.

McFADDEN, Justice.

On April 21, 1972, plaintiffs-respondents Norman F. and Lillian E. Linscott purchased three policies of insurance for their 26-year old daughter Laurelie. Each of these policies included among its benefits $25 per day for hospital room expenses. Laurelie died almost a year later, on April 9, 1973. Both parties to this suit now concede that in the interim before her death Laurelie spent 57 days in various hospitals for which the policies made Rainier Life liable to Mr. and Mrs. Linscott (as named beneficiaries) in the amount of $75 per day, for a total of $4,275.

Because Rainier Life initially refused to acknowledge its liability, however, the Linscotts filed this action, asking that Rainier's liability under the policy be adjudged, and that it also be assessed $125,000 in punitive damages, $15,000 in damages for mental anguish, and reasonable attorney's fees. Before trial (but after the complaint was filed) Rainier admitted its liability under the policies and tendered $4,575 into court.[1] Trial was had on the mental anguish, punitive damages, and attorney fees issues.

The evidence at trial showed that Rainier first indicated it did not intend to honor the policies about eleven months after it issued them. Early in March 1973, the company wrote Laurelie to say that it had learned that she had had epilepsy at the time of her application for the insurance, that the company did not insure against epilepsy and that Laurelie had not mentioned it as a preexisting condition in her applications. It stated that it therefore could not honor the policies and asked their return. It stated that upon the policies' return the company would refund all premiums paid.

This was the opening letter in a correspondence which lasted some six months and is chronicled in plaintiffs' exhibits 4–19. Throughout this time it was the position of

Laurelie's doctors (who so informed Rainier Life), the agent who sold her the policies, and the Washington State Insurance Commissioner (with whom the Linscotts lodged a complaint), that Rainier Life's grounds for refusing to honor the policies were erroneous. Letters from the doctors, while far from clear, suggest that Laurelie's condition was not epilepsy, as the term is commonly understood, but rather a "seizure disorder" which resulted from the removal of her pituitary gland in a 1965 operation. Yet no evidence, aside from the doctors' letters, was offered at trial to define "epilepsy" or to determine whether Laurelie actually suffered from it. Epilepsy is not listed as an exclusion in the policies or on the application forms, nor does the word or any reference to it appear anywhere on the policies or the application forms. Laurelie did not list epilepsy as a preexisting condition, but she did disclose her high blood pressure and diabetes, and the 1965 pituitary gland removal.

After the Linscotts filed suit to compel payment under the policies and to recover the other damages which are the subject of this suit, Rainier answered, alleging that it had employed proper business practices in evaluating the Linscotts' claims. Since the answer came after the company had admitted liability under the policies, it included a counterclaim which stated that the Linscotts' pursuit of the claim after the admission amounted to "vexatious" litigation, and prayed for $5,000 punitive damages. The counterclaim was dismissed on Rainier's motion shortly before trial.

At trial the Linscotts placed in evidence the series of letters discussed above and the policies. Mr. and Mrs. Linscott also testified that they did not believe that their daughter had misrepresented her physical condition at the time of the application.

1. This figure reflected $4,275 for 57 days at $75 per day, plus $300 for reasonable attorney fees. The Linscotts originally maintained that the proper figure was 63 days, but shortly before trial they accepted 57. During a preliminary conference at trial, counsel for the Linscotts stated that he had attempted to draw the mon-

ey down under the terms of a court order dated August 22, 1975, but had been unable to do so because of a problem with the manner of tender. At oral argument the parties indicated that the Linscotts still have received no payment from Rainier Life.

Rainier Life called no witnesses, only placing in evidence ten documents. Two of them are a request for documents made by Linscotts' counsel which Rainier honored, and eight of them chronicle the settlement negotiations. All are offered solely to show Rainier's good faith in initially denying the claim.

The trial judge denied the Linscotts' claim for damages for mental anguish, but awarded them $1,800 as reasonable attorney fees under I.C. § 41–1839,[2] and $20,000 punitive damages.[3] On this appeal Rainier argues that the evidence did not support an award of punitive damages and that, in any case, the award of punitive damages was excessive.

### I

Punitive or exemplary damages are a peculiarity in the law of damages. Unlike other damages awards, their purpose is not to compensate the plaintiff, but to express the outrage of society at certain actions of the defendant. As such, they act as punishment, and serve to deter the defendant, and others in a similar position, from engaging in like conduct in the future. In Idaho the punishment rationale is disfavored. As this court said in a recent case:

"[W]e feel that the courts in these civil cases should be motivated primarily by a purpose of deterrence and not by a purpose of punishment. In other words, the assessment of exemplary damages should be prompted by the court's or jury's desire to assure, to the extent possible via the imposition of a monetary penalty, that similar conduct does not occur in the

future. Punishment, per se, should be left to the criminal law." *Jolley v. Puregro Co.,* 94 Idaho 702, 708–9, 496 P.2d 939, 945–6 (1972). (Citations omitted.)

Even for deterrence, punitive damages "are not a favorite of the law, and the power to give such damages should be exercised with caution and within the narrowest limits." *Jolley, supra,* 94 Idaho at 709, 496 P.2d at 946; *Williams v. Bone,* 74 Idaho 185, 189, 259 P.2d 810, 812 (1953). Punitive damages, then, are awarded only in the face of conduct on the part of the defendant which society considers so reprehensible as to require an extraordinary remedy. The standard for recognizing such conduct was first stated in 1911 in a case involving tortious conduct:

"As we understand the rule of exemplary or punitive damages, they cannot be recovered unless the evidence shows clearly that the action of the wrongdoer is *wanton, malicious,* or *gross* and *outrageous,* or where the facts are such as to imply *malice* and *oppression* . . . ." (Emphasis added.) *Unfried v. Libert,* 20 Idaho 708, 728, 119 P. 885, 891 (1911).

Almost every punitive damages case decided in Idaho since has quoted this language. *See, e. g., Jolley v. Puregro Co., supra; Zollinger v. Big Lost River Irrig. Dist.,* 83 Idaho 411, 418, 364 P.2d 176, 179 (1961); *Klam v. Koppel,* 63 Idaho 171, 180–1, 118 P.2d 729, 733 (1941).

There is perhaps potential for confusion in this array of adjectives surrounding the area of punitive damages, and we have given them liberal construction in the past

---

2. I.C. § 41–1839 states in pertinent part:

"(1) Any insurer issuing any policy, certificate or contract of insurance, surety, guaranty or indemnity of any kind or nature whatsoever, which shall fail for a period of thirty (30) days after proof of loss has been furnished as provided in such policy, certificate or contract, to pay to the person entitled thereto the amount justly due under such policy, certificate or contract, shall in any action thereafter brought against the insurer in any court in this state for recovery under the terms of the policy, certificate or contract, pay such further amount as the court

shall adjudge reasonable as attorney's fees in such action.

"(2) In any such action, if it is alleged that before the commencement thereof, a tender of the full amount justly due was made to the person entitled thereto, and such amount is thereupon deposited in the court, and if the allegation is found to be true, or if it is determined in such action that no amount is justly due, then no such attorney's fees may be recovered."

3. The trial judge also awarded the Linscotts the $4,575 for which Rainier had stipulated its liability under the terms of the policies.

to avoid injustice. *Thompson v. Dalton*, 95 Idaho 785, 788, 520 P.2d 240, 243 (1974). The activity which this court has sought to reach with an award of punitive damages, however it is phrased, requires an intersection of two factors: a bad act and a bad state of mind. To describe the former the court has used at various times the following terms:[4] "deceit," *Prudential Federal Sav. & Loan Ass'n v. Johnson*, 93 Idaho 850, 853, 476 P.2d 786, 789 (1970); acting "to violate another's legal right," *Village of Peck v. Denison*, 92 Idaho 747, 752, 450 P.2d 310, 315 (1969); or "for purpose of injuring plaintiff," *Williams v. Bone*, 74 Idaho 185, 189, 259 P.2d 810, 812 (1953); or "to oppress," *White v. Doney*, 82 Idaho 217, 224, 351 P.2d 380, 384 (1960); or acting "[in] disregard . . . of the known property rights," *Cox v. Stolworthy*, 94 Idaho 683, 685, 496 P.2d 682, 684 (1972); and "fraud," *Morrison v. Quality Produce Inc.*, 92 Idaho 448, 450, 444 P.2d 409, 411 (1968); *Boise Dodge, Inc. v. Clark*, 92 Idaho 902, 907, 453 P.2d 551, 556 (1969).

To describe bad state of mind the following terms have been used: "deliberate," *White v. Doney, supra*, 82 Idaho at 224, 351 P.2d at 384 (1960); "gross negligence," *Morrison v. Quality Produce, supra*, 92 Idaho at 450, 444 P.2d at 411 (1968); *Gunnell v. Largilliere Co.*, 46 Idaho 551, 560, 269 P. 412 (1928); *Cox v. Stolworthy, supra*, 94 Idaho at 685, 496 P.2d 682, 684 (1972).

In two cases involving breach of a contract, this court even held that it was proper to award punitive damages when there was "other sufficient reason," *Prudential Fed. Sav. & Loan Ass'n v. Johnson, supra*, 93 Idaho at 853, 476 P.2d at 789; *Boise Dodge, supra*, 92 Idaho at 907, 453 P.2d at 557.

 Simply invoking these words is never enough in itself, of course, to justify an award of punitive damages—it is the act complained of and the attendant state of mind which are crucial. As a leading authority in the law of damages puts it,

"[S]ince courts have not been at all concerned with any shades of difference that might be found, between, say, malice and recklessness, almost any term that describes misconduct coupled with a bad state of mind will describe the case for a punitive award." D. Dobbs, Law of Remedies § 3.9 at 205 (footnote omitted) (1973).

In Idaho, then, so long as the evidence shows that there has been an injury to the plaintiff from an act which is an extreme deviation from reasonable standards of conduct, and that the act was performed by the defendant with an understanding of or a disregard for its likely consequences (in the words of prior cases, with fraud, malice or oppression), it is appropriate for the trier of fact to award punitive damages.

Initially it was also the rule in most American jurisdictions, whether established by statute, *see, e. g.* Cal.Civ. Code § 3294 (1872), or by the common law, that punitive damages may not be awarded in contract actions. *See, e. g.*, 5 A. Corbin, Corbin on Contracts 437 § 1077 (1964); J. Calamari and J. Perillo, Law of Contracts 520 § 14–3 (2d ed. 1977); Restatement of Contracts, § 342 (1932); Comment, Exemplary Damages in Contract Cases, 7 Willamette L.J. 137, 138 (1971). Various explanations are offered for the wide acceptance of this rule. Professor Corbin believes that it reflects the feeling that the breaking of a promise, while not to be sanctioned, is nonetheless not sufficiently extreme conduct to require more than that the breaker be held to the promise. 5 A. Corbin, Corbin on Contracts 438 § 1077 (1964). Others feel that it reflects the fundamental choice of American jurisprudence that the role of contract law should be relief rather than compulsion. Farnsworth, Legal Remedies for Breach of Contract, 70 Col.L.R. 1145 (1970). Of course, at one time the distinction between tort and contract was not particularly well-

---

4. We do not hold as a matter of law that the following cases stand only for the language quoted from them. This listing is offered only to illustrate the complex and often vague verbiage which the court has relied on in the past to define the standard for the award of punitive damages.

drawn, and at least one commentator suggests that the rule reflects nothing more than historical accident:

> "Since it was easier to develop objective standards for measuring the damages caused by breach of a contract than by tortious injury, the common law courts were able to limit the jury's discretion in contract actions much earlier than in tort actions. By the time the courts recognized the need for punitive damages, the rule forbidding them in breach of contract actions was too firmly established by precedent to be disturbed." Note, The Expanding Availability of Punitive Damages in Contract Actions, 8 Indiana L.R. 668, 670 (1975).

Another commentator suggests that the rule may have appeared almost spontaneously:

> "[W]e must begin without any firm idea of *why*, beyond adherence to traditional English standards, American courts have held, as a general rule, that punitive damages should not be awarded for breach of contract.
>
> "Many of the older decisions that rejected the award of punitive damages in contract and troubled to cite any authority at all made summary reference to the treatises then popular. An examination of the treatise cited is likely to produce no more enlightenment than the opinion which invoked its authority." Sullivan, Punitive Damages in the Law of Contracts: The Reality and the Illusion of Legal Change, 61 Minn.L.R. 207, 221 (1977). (Citations omitted.)

Wherever it came from, examination of punitive damages cases indicates that the general rule has never functioned as an absolute bar to the award of punitive damages in contract actions, for courts have fashioned a variety of exceptions. While nominally upholding the general rule, some courts state that in a few particular contract settings the rule does not apply.[5]

Others hold that where the breach of contract amounts, in itself, to an independent tort, punitive damages will be allowed. *See, e. g., Z. D. Howard Co. v. Cartwright,* 537 P.2d 345 (Okl.1975); *MacDonald v. Penn Mut. Life Ins. Co.,* 276 So.2d 232 (Fla. App.1973); *Gonzales v. Allstate Ins. Co.,* 217 Kan. 262, 535 P.2d 919 (1975); *Ash v. Barrett,* 1 Ill.App.3d 414, 274 N.E.2d 149 (1971). Others hold that the presence of fraud will give rise to an action for punitive damages. *See generally,* Teeple, When, If Ever, Are Punitive Damages Recoverable in an Illinois Contract Action? 65 Ill.B.J. 152 (1976). A few courts have simply held that when the proper mix of conduct and state of mind is present nothing bars the award of punitive damages in any contract action. *Vernon Fire and Cas. Ins. Co. v. Sharp,* 161 Ind.App. 413, 316 N.E.2d 381 (1974) *modified on other grounds,* 264 Ind. 599, 349 N.E.2d 173 (1976); *Sierra Blanca Sales v. Newco,* 88 N.M. 472, 542 P.2d 52 (1975) rev'd on other grounds, 89 N.M. 187, 548 P.2d 865 (1976); *Adams v. Whitfield,* 290 So.2d 49 (Fla.1974).

Adoption of the latter position, commendable for its forthrightness and clarity, is hardly what could be called a radical departure from prior law. The general rule "has never really been the impenetrable barrier it has appeared to be. Many of the so-called established exceptions to the general rule simply have afforded traditional courts more latitude in escaping the strictures of the rule without seeming to violate it. In some jurisdictions, the so-called exceptions have been construed broadly enough to raise doubts as to the continuing viability of the rule.

. . . . .

> "[Cases which simply reject the general rule] evidence a tendency to decide directly what many earlier courts had been at pains to conceal: there really are no insurmountable *theoretical* objections to the award of punitive damages for breach

---

**5.** These include breach of a contract to marry, suits against a common carrier, a bank, or a public utility, and, more recently, suits against an insurance company for failure to settle or pay claims. *See generally,* Sullivan, *supra,* 61 Minn.L.R. at 220–26; Note, *supra,* 8 Indiana L.R. at 677–79.

of contract on a basis similar to that which governs in the typical tort case, that is, where defendant's conduct is oppressive or malicious." Sullivan, *supra*, 61 Minn.L.R. at 246–7.

Whatever the justification for the "original" rule, in the modern era numerous situations arise where the breaking of a promise may be an extreme deviation from standards of reasonable conduct, and, when done with knowledge of its likely effects, may be grounds for an award of punitive damages. Like a tort, many such breaches may be impossible to insure against. Particularly in cases marked by a gross disparity of bargaining power between the parties to the contract, the award of punitive damages may be useful as a sanction against oppressive conduct in the marketplace.

■ In the case of an insurance company which initially refuses to pay a valid claim when liability under the policy is later established, the plaintiff may be entitled to an award of attorney fees under I.C. § 41–1839, discussed *infra*. To be entitled to an award of punitive damages the plaintiff must show, in addition, that the company's refusal *promptly* to pay the claim was an extreme deviation from reasonable standards of conduct, performed with an understanding of its consequences.[6] In this case the trier of fact was justified in concluding that the Linscotts had shown that Rainier Life's refusal to make payments under the policy was totally unjustified. Rainier had offered, at various times, three grounds for its refusal to make payments:

■ 1. It claimed that epilepsy was a condition against which it did not insure. At trial the Linscotts put the policies and the application forms in evidence. Nowhere in the body of the policies, which were of course drafted by Rainier Life, or on the application forms, is there any mention of Rainier's policy of not insuring against epilepsy. Contracts of insurance are, of course, strictly construed against the drafter. *Abbie Uriguen Oldsmobile Buick, Inc. v. United States Fire Ins. Co.*, 95 Idaho 501, 511 P.2d 783 (1973); *Stephens v. New Hampshire Ins. Co.*, 92 Idaho 537, 447 P.2d 14 (1968). But there is no need for strict construction here: the term is simply not a part of the contract between the two parties and could not unilaterally be read into it by Rainier Life.

2. It also claimed, in its counterclaim and on appeal to this court, that Laurelie had misrepresented her condition to Rainier's agent at the time of her application for the policies. However, the Linscotts were present at the time their daughter purchased the policies and testified at trial that they did not believe she purposely misrepresented her physical condition. This was competent evidence of Laurelie's state of mind at the time, and the trial judge was free to believe it, particularly since Rainier Life did not introduce any evidence on the issue at all. Indeed, Rainier Life ultimately requested the court to dismiss its counterclaim and the request was granted.

■ 3. Finally Rainier Life claimed that Laurelie had failed to disclose a preexisting condition, and that this gave it the right to rescind the policies. The pertinent language of the policies (it is identical in each of the three) is found in part 7 on page 3 and reads as follows:

"4. Preexisting conditions. Any condition commencing or having its inception prior to the effective date of this policy shall be covered after a period of six months from the effective date of the policy only if such conditions are admitted on the application for insurance contained in this policy."

This clause gave Rainier Life the right not to pay any claims which arose as a result of an undisclosed preexisting condition. It did not afford it the right to rescind the policy.

---

6. Of course, it might be shown that in denying the claim the company committed some independently tortious act, which would give rise in itself to an award of punitive damages. Since the issue was only indirectly argued by the Linscotts on appeal, we express no opinion as to whether Rainier Life's counterclaim in this case might have been grounds for a claim of malicious prosecution.

Much energy was expended before this case came to trial in an attempt to discover just exactly what the nature of Laurelie's "seizure disorder" was. The evidence seems to show that she suffered seizures that resulted from the removal of her pituitary gland. The insurance application form shows that she did disclose the pituitary gland removal, but that she made no mention of seizures as a result of that removal.

Had Rainier Life been able to show that disclosure of the pituitary gland removal, as a matter of medical and legal fact, did not in and of itself also amount to the disclosure of a seizure disorder, then they might have justifiably refused to pay claims arising from the seizure disorder. The fact that they admitted liability under the policy may indicate that they could not have shown this. No attempt was made at trial to clearly define the cause of Laurelie's "seizure disorder" or to show the medical reasons for the claims which were made under the policy. In no case, however, short of a showing of fraud, would the nondisclosure have provided cause for Rainier Life's rescinding the policies.

The evidence therefore shows, first, that Rainier Life's refusal to honor the policies was totally unjustified; and, second, that even had it proved that Laurelie had epilepsy and that she had not disclosed this on the application forms, it still attempted to go further than it could have by claiming to rescind the policies. This evidence suggests that the insurance company was acting in bad faith. There is merit in the observation by counsel for the Linscotts in their brief that "[t]he company has everything to gain by fighting a bad fight and nothing to lose but interest on its just obligation." Under these facts the trial judge was justified in making an award of punitive damages.

By way of a *caveat* to this opinion, it must be pointed out that nothing herein is to be construed as in any way approving the awarding of punitive damages in an ordinary breach of contract case. Punitive damages may only be considered in those cases where there has been alleged in the pleadings and proof of conduct by one party involving some element of outrage similar to that usually found in the commission of crimes or torts done intentionally or with reckless indifference to the rights of the other party (*e. g.* fraud) or with an evil motive, (*e. g.* to vex, harass, annoy, injure or oppress) in conscious disregard of the rights of the injured person. *See Prudential Federal Savings & Loan Ass'n v. Johnson,* 93 Idaho 850, 853, 476 P.2d 786 (1970). *See also Silberg v. California Life Ins. Co.,* 11 Cal.3d 452, 113 Cal.Rptr. 711, 521 P.2d 1103 (1974). Restatement (2d) of Torts, § 908 and comment b; Restatement of Contracts § 342.

## II

We now turn to a consideration of appellant's claim that the amount of the award made by the trial judge was excessive. Under the analysis of punitive damages of *Cox v. Stolworthy, supra,* the punitive damages award must be reduced. In *Cox* the court summarized Idaho's law of punitive damages and concluded that all of the cases which had been decided at the time fit into one of three categories. The three categories were characterized as follows:

"The first concerns those cases involving deceptive business schemes operated for profit and often victimizing numerous members of the public aside from the plaintiff. Clearly in such cases the award of exemplary damages should aim at making the cost of such repetitive antisocial conduct uneconomical. Thus, for example, in *Boise Dodge, Inc. v. Clark, supra,* cross-complainant was one victim of a fraudulent scheme. A generous award of exemplary damages served to remove the profit factor from the whole scheme. [citations omitted]

"The second category is illustrated by the *Village of Peck v. Denison* decision, *supra.* There defendants' repeated actions endangered the physical well-being and health of the several hundred citizens of the town. Where actual physical harm is threatened or actually inflicted on a per-

son or persons the situation rises to a serious level of affairs. In such a case where the plaintiff's physical well-being is endangered, a substantial punitive damages award finds justification in the nature of the malicious conduct itself as well as the quality of the injury sustained.

"The case at bar fits neither of these categories. However, a third category of cases does seem applicable. These cases typically involve non-violent but nevertheless serious disputes between two parties. Often the dispute centers on an interest in real or personal property or an interference with a business operation.

. . . . .

"In such situations in the past this Court has not looked favorably on large punitive damage awards for the apparent reason that the nature of the dispute did not warrant a severe penalty to the wrongdoer—an award out of proportion both to the activity complained of and the damages incurred." 94 Idaho at 691, 496 P.2d at 690.

In *Thompson v. Dalton, supra* 95 Idaho at 791, 520 P.2d at 246, the court held that "one instance of unconscionable business conduct" does not amount to a "business practice." To fit into *Cox's* first category, the burden rests on the plaintiff to demonstrate that such a scheme exists, and we will not infer its existence from a silent record. Not one shred of evidence in the instant case suggests that Rainier Life ever engaged in similar activities on other occasions. Respondent's argument in its brief that no evidence exists to suggest that Rainier Life did *not* engage in this type of activity on other occasions of course attempts to place the burden where it does not belong. We decline to place this case in *Cox's* first category.

Nor does the record show that Rainier Life endangered "the physical well-being

and health" of the Linscotts, within the sense of *Cox's* second category, as amplified in *Thompson v. Dalton, supra.*[7] The trial court here, in denying the Linscotts' claim for damages for mental anguish, expressly found that they had not suffered physical injuries and the record does not show that Rainier Life's actions were calculated to cause such injury.

The foregoing discussion makes it clear that the case at bar fits within that broad third category of cases set out in *Cox* which involve "nonviolent but nevertheless serious disputes between two parties." In *Cox* it was held that punitive damages in such a case should be limited to the measure of (1) the plaintiff's reasonable and necessary attorney fees in bringing the action, (2) other related expenses not ordinarily recoverable such as expert witness fees, and (3) reasonable reimbursement for the time and effort required to bring the action. *Cox, supra,* 94 Idaho at 691–2, 496 P.2d at 691–2.

In applying these standards to the case at bar, we note that the determination of specific amounts of punitive damages is in the first instance for the trial court. The trial court here did make an award of attorney fees, in the amount of $1,800, and while we do not disturb that amount on appeal, we affirm it as an award of punitive damages rather than as an award under I.C. § 41–1839. *See, infra.* The trial court made no determination of amounts expended for expert witness fees and other necessary expenditures, or of what amounts would be appropriate to reimburse the Linscotts for the time and effort required to bring this action. We therefore remand this case to the district court to make such findings.

Appellant argues that the amount of the award of punitive damages was excessive because it provided for a double recovery of attorney fees. The trial court made an award of attorney fees under I.C. § 41–1839, *supra,* in the amount of $1,800. Al-

7. In *Thompson* we affirmed a relatively large award of punitive damages because the plaintiff's trailer home had been removed from her lot while she was out of town. In so doing, the defendant had threatened her "physical well-

being and health" and the case came within the second category of *Cox,* despite the fact that the dispute in question involved only two persons.

though the $1,800 should have been awarded as punitive damages rather than under I.C. § 41–1839, it appears that the amount is correct as reasonable compensation to the Linscotts for attorney fees expended in bringing the action. Under the measure of punitive damages discussed above there is no duplication.

Since we have reduced the award of punitive damages on other grounds, we do not reach appellant's argument that the award was excessive because the trial court failed to take into account the fact that Rainier Life was apparently in considerable financial difficulty at the time of trial and is now in receivership.

This case is remanded with instructions to the district court to make findings and enter judgment as indicated in this opinion. No costs allowed.

DURTSCHI, LODGE, THOMAS and SWANSTROM, JJ., Pro Tem., concur.