659 P.2d 766

**Thomas B. CAMPION and Lynn H. Campion, Husband and Wife, Plaintiffs-Appellants,**

v.

**Owen SIMPSON, Defendant-Respondent.**

No. 12173.

Supreme Court of Idaho.

Feb. 16, 1983.

Robert M. Tyler, Jr. of Elam, Burke, Evans, Boyd & Koontz, Boise, for plaintiffs-appellants.

Lloyd J. Walker, Twin Falls, for defendant-respondent.

HUNTLEY, Justice.

This litigation involves a reach of the Big Wood River south of the Warm Springs Bridge in Ketchum, Idaho. Campion owns a home with adjacent land on the east bank and Simpson owns property suitable for development on the opposite bank.

Prior to the late 1960's, there were three channels of the Wood River in the vicinity of the Campion-Simpson properties, the main channels being designated by the parties as channels 2 and 3 for the purpose of this action, with the third and smallest channel being designated channel 1. There was an island between channels 2 and 3 which was wooded and had been in existence for more than thirty years.

This action arises as a claim for damages and for injunctive relief by Campion by virtue of the fact that in June 1974 Campion's property was damaged by erosion and washout of the beach and river bank near his house, the loss of four or five trees near the house, and the washing away of the island and its trees which had provided Campion with a measure of privacy and seclusion.

Campion's action against Simpson is based upon Simpson having diminished the water-carrying capacity of the river system, having redirected the river directly toward Campion's property through the action of filling in and obliterating channels 1 and 2 during the period 1968–74, and Simpson's further action of re-diking his blockage of channels 1 and 2 during the June 1974 flood when the river was attempting to re-enter and discharge a portion of its volume through channels 1 and 2.

The case was initially tried before Judge Kramer, who entered findings of fact, conclusions of law and judgment, which ruled in effect that Simpson's blockage of channel 2 was tortious, that the blocking of channel 1 was not actionable, and that Campion was entitled to nominal damages in the sum of $500.00 and punitive damages of $500.00.

From that judgment, Campion appealed as to two issues: (1) that the court erred in ruling that the interference by Simpson with channel 1 was not tortious; and (2) that the court erred in failing to award substantial compensatory damages and substantial punitive damages.

After the appeal was filed, it was discovered that the court reporter had lost his notes and was unable to provide a transcript. Accordingly, at Campion's request, this court remanded to the district court (Judge Kramer thereafter disqualified himself from further proceedings) for a trial the purpose of which was to establish an evidentiary record on two limited issues: (1) the status of channel 1; and (2) the award of damages for destruction of property belonging to Campion.

The record to be so reconstructed was to be used by this court to determine the issues raised on appeal, *i.e.,* does the evidence support the findings of fact, and is there any error in the conclusions of law and judgment entered by Judge Kramer.

The record establishes that of the thirty-three findings of fact and twenty-nine conclusions of law entered by Judge Kramer, all are supported by substantial and competent evidence with the exception of his findings and conclusions related to two areas, those being his ruling that Campion could not recover damages for the blockage by Simpson of channel 1, and his award to Campion of general and punitive damages in the amounts of $500.00 each. We will discuss each issue in turn.

## THE CHANNEL 1 ISSUE

With respect to channel 1, Judge Kramer found that Simpson was engaged in filling up that channel (as well as channel 2) between 1968 and 1974 and that but for the filling of those two channels, much of the spring flood waters would have flowed through those channels, and that the quantity of and velocity of the water contained in channel 3 during high water periods would have been significantly diminished but for the closing of those two channels. He further found that the alterations of channels 1 and 2 by Simpson caused the Wood River to be channeled directly against the Campion property, damaging and eroding it and causing the property to be continually exposed in the future to the direct attack of the river.

The trial court further found that Simpson's actions were intentional, that they were an interference with the public's right in and to the use of the waters of the Wood River, and the beds, channels and banks thereof, and in finding 16 stated:

"There was evidence that the Defendant [Simpson] by filling Channel 1 and Channel 2 was engaged in an intentional and systematic scheme of enlarging his land holdings, but the evidence also could be construed to be that the Defendant was protecting his property."

Despite its findings, the trial court held that Simpson's filling of channel 1 was not actionable as to Campion because channel 1 was not "navigable" and was not an integral part of the Wood River because it did not carry a substantial quantity of water the year around. In so ruling the trial court erred.

As early as 1911 in *Fischer v. Davis,* 19 Idaho 493, 498–99, 116 P. 412, 413, this court recognized that

"[a] riparian owner of lands abutting upon a stream has no right to place obstructions out into the stream for the purpose of changing the natural course of the river, or for any other purpose that would do damage to a riparian owner on the opposite side or to owners of land abutting upon said stream either above or below."

This rule was reaffirmed in *Milbert v. Carl Carbon, Inc.,* 89 Idaho 471, 406 P.2d 113 (1965); *Harper v. Johannesen,* 84 Idaho 278, 371 P.2d 842 (1962); *Chandler v. Drainage Dist. no. 2,* 68 Idaho 42, 187 P.2d 971 (1947).

This court has not limited this rule to navigable rivers. In *Milbert v. Carl Carbon, supra,* we stated:

"A riparian owner of land abutting upon a stream, *whether navigable or non-navigable,* has the right to place such barriers as will prevent his land from being overflowed or damaged by the stream, and for the purpose of keeping the same within its natural channel. *A riparian owner, however, has no right to place obstruction into the stream for the purpose of changing the natural channel of the stream,* or for any other purpose, that would do damage to the riparian owner on the opposite side or to owners of land abutting upon the stream either above or below. *Boise Development Company v. Idaho Trust & Savings Bank,* 24 Idaho 36, 133 P. 916 (1913); *Fischer v. Davis,* 19 Idaho 493, 116 P. 412 (1911)." (Emphasis added.) 89 Idaho 478.

Channel 1 was a natural part of the stream system. Since the trial court found that Simpson *placed an obstruction* in the stream system which partially blocked it and diverted the waters against Campion's property causing damage thereto, Simpson's wrongful acts give rise to a cause of action for which Campion is entitled to damages.

## THE DAMAGE ISSUE

The trial court awarded Campion nominal compensatory damages of $500.00

plus punitive damages of $500.00 based upon an erroneous assumption that Campion had the burden of proving that Simpson's actions were the "sole and proximate cause of the damage." The court's memorandum decision, incorporated by reference as a formal part of the findings and conclusions, reads in part as follows:

"His [Simpson's] actions, however, cannot be found to be the sole and proximate cause of damage to Campion, but did contribute in a nominal way to the damage. That damage is five hundred dollars ($500.00) plus punitive damages of five hundred dollars ($500.00)."

It is not clear whether the court had reference to the fact that in large measure the flood was obviously an "act of God" or whether the court had reference to the testimony that other parties, including the City of Ketchum and Campion himself, had participated in other alterations to the river such as the construction of the Paynter Dike upstream years earlier, the reinforcement of that dike during the 1974 flood, and that alterations had been made by the City of Ketchum in constructing the bridge near the Campion-Simpson property prior to the flood.

However, neither of those reasons constitute a bar to Campion receiving full compensation against the tortfeasor he has sued.

With respect to the possible "act of God" defense, it must be noted that Simpson did not plead that defense, and had he done so it would not have constituted a defense under the rule of law enunciated by this court in *Axtell v. Northern Pac. Ry. Co.*, Idaho 392, 398, 74 P. 1075, 1078 (1903), wherein this court stated:

"It has also been contended with much persistence both upon the oral arguments and in the briefs that the damage, if any, sustained by plaintiff, resulted from the acts of God and the forces of nature, and that the defendant is not liable therefor. Since this case must be sent back for a new trial, we have thought it best to make some observations upon this point. It must be conceded that if the position of the defendant is correct, and the fact can be established upon the trial, that the damage sustained by the plaintiff is due to *vis major* and the forces of nature, then plaintiff cannot recover. *On the other hand, if the plaintiff should establish by a preponderance of the evidence that the defendant, by its wrongful acts, contributed to those causes, then we think it would be liable.* The defendant cannot be held responsible for the destruction of plaintiff's property by the floods poured out by nature; *but if while those floods are raging the defendant, by its unlawful acts, dams up the streams and means of escape for those waters, and thereby causes them to break over the banks and wash away and destroy the property of the plaintiff, we think the defendant would be liable.*" (Emphasis supplied.)

Judge Kramer made specific findings that the filling of channels 1 and 2 by Simpson constitute a public nuisance and a trespass in the channel of the Wood River.

As to the possible responsibility of third parties, it must be noted that the court found no damages in favor of Simpson on his cross-complaint against those possible third parties, the parties did not try this case as a comparative negligence action under the Idaho Contribution Among Joint Tortfeasors Act, and the court did not assess any percentage of negligence or causation as against Campion or any third party. Additionally, there is no motion pending or unresolved before the trial court by Simpson requesting dismissal upon failure to join an indispensable party.

The court, having found that Simpson's acts were a proximate cause of Campions' losses, should have awarded Campion full compensatory damages under the rule enunciated in the jury instructions approved in *Valles v. Union Pacific RR.*, 72 Idaho 231, 238, 238 P.2d 1154, 1158 (1951):

"[W]here several causes combine to produce injuries, a person is not relieved from liability because he is responsible for only one of them, it being sufficient that his negligence is an efficient proxi-

mate cause, without which the injury would not have resulted, and that such other cause is not attributable to the negligence of the plaintiff. It is no defense to any of the several defendants that the injury would not have resulted from his negligence alone, without the concurrent negligence or wrongful act of the other defendants."

Accordingly, we hold that Simpson is liable for all of the damages properly established at the hearing before Judge Granata.

At this juncture, this court would have the alternative of reversing and remanding the case for findings as to general and punitive damages by Judge Granata, or, determining from the record, the damages which are established.

Judge Granata has already entered findings of fact and conclusions of law, evidencing his view of the damages proven, which findings and conclusions were the subject of a separate appeal filed by Owen Simpson, no. 13573, which findings and conclusions were stricken by this court upon dismissal of that appeal on the ground that the entry thereof went beyond the bounds of the remand order, which was limited to reconstruction of an evidence record.

Upon review of this record, both as against the findings and conclusions of Judge Kramer and the findings and conclusions of Judge Granata, it appears that there are certain damage issues which cannot be resolved without some further trial court proceedings, and therefore we remand the case to the trial court for resolution of the damage and injunctive relief issues pursuant to the following guidelines:

(1) The record establishes Campion's right to compensatory damages for emergency riprapping performed at the time of the June 1974 flood in the sum of $2,400.00, and the sum of $8,885.00 for future riprapping.

(2) The trial court (Judge Granata), relative to the request for injunctive relief, found as follows:

"The river will not regain its stability until Channel 1 is reopened. It is necessary to reopen Channel 1 to abate or remove the risk to the plaintiff's property and to the safety of their home created by the actions of the defendant."

He then directed that Simpson remove the obstructions to channel 1 and any existing obstructions in channel 2 and that in the event there were any objections to that requirement that the parties would have another hearing before the court.

He then proceeded to award Campion judgment of $20,000.00 for additional risk of increased flooding due to lower market value from that increased risk, and $50,000.00 for general reduced market value due to the loss of the island, several large mature trees, the beach area, a portion of the Campion yard, and the loss of seclusion and privacy.

We see the following difficulties with the totality of those proposed awards. First, if channel 1 and 2 are restored to their natural state, the record is not clear as to whether there will remain the increased risk and lowered market value to support the $20,000.00 award.

Second, with respect to the proposed award of $50,000.00, there are certain basic and material defects in the testimony provided by Campion. In *Smith v. Big Lost River Irrig. Dist.*, 83 Idaho 374, 385, 364 P.2d 146, 152 (1961), the rule is stated:

"'If the land is permanently injured, but not totally destroyed, the owner will be entitled to recover the difference between the actual cash value at a time immediately preceding the injury and the actual cash value of the land in the condition it was immediately after the injury, with legal interest thereon to the time of the trial.'"

Mr. Campion's testimony of a $50,000.00 dimunition in value was based on his statement that the property would be "worth $50,000.00 more *today* [August 1979] if the island, trees and beach were still there." Such testimony is not competent to establish the "before and after" value in 1974.

Likewise, the testimony of the appraiser, Mr. Monge, was based upon his initial premise that the property as of the time of

the trial [August 1979] was worth $350,-000.00 to $400,000.00. He testified that the flood caused a 15% change in value, but never applied that to 1974 values.

He then stated that as of 1979 the property would be worth $50,000 to $75,000 more if it had the privacy and seclusion that it previously had.

■ In short, there is no competent evidence in the record as to the before and after value of the property in 1974, and no award can properly be made for the alleged $50,000 diminution in value. Further, no award should be entered for the $20,000 "additional risk" factor unless the court finds the risk remains after channel 1 is reopened or that the risk remains because channel 1 cannot be reopened.

Accordingly, we remand to the trial court for further proceedings on the damages and injunctive relief issue in accordance with this decision. We leave to the trial court the determination of whether at this date injunctive relief remains appropriate.

The opening of channel 1, if ordered by the trial court, any further work ordered on channel 2, and any riprapping to be performed on the east bank shall all be done in accordance with a plan first approved by the Idaho Department of Water Resources.

We also remand for determination by the trial court the fixing of punitive damages. The punitive damages shall be measured by the standards enumerated for the "non-violent private business dispute" category in *Linscott v. Rainier National Life Insurance Co.,* 100 Idaho 854, 606 P.2d 958 (1980), incurred by the Campions in presenting the initial hearing before Judge Kramer together with those same expenses attendant upon the remand hearing and his attorney fees on this appeal; but excluding those expenses in connection with the initial hearing before Judge Granata and the attorney fees in appeal no. 13753.

Costs and attorney fees to the appellant, both to be fixed by the trial court.

DONALDSON, C.J., and McQUADE and HARGRAVES, JJ., Pro Tem., concur.

BISTLINE, Justice, dissenting.

Basically, the nature of this controversy stems from the fact of a river the channel or channel beds of which can only accommodate so much run-off water when the snowpack of the surrounding mountains comes down all at once. It is an age-old problem with many rivers in the west whose drainage includes mountains which accumulate snow packs for nine to ten months of every year. To that backdrop is added that river frontage has become desirable, especially on the Wood River, which is the main river running through Ketchum, Idaho, and central to an internationally famous ski and summer recreation resort. River frontage property has become valuable, people have built upon it, and they have endeavored to build protective works to avoid demolition of or destruction to their valuable properties occasioned by those annual run-offs.

As the Wood River faced flood stages in June of 1974, the plaintiffs, Mr. and Mrs. Campion, filed this action claiming damages for the diminution of their property values allegedly occasioned by defendant Simpson's activities along the river, which were alleged to threaten increased danger from floods. The Campions initially sought immediate mandatory relief which if afforded would have caused Simpson to remove certain fill "from the side and main channels of the Wood River," and a temporary restraining order requesting that Simpson commence doing so immediately and while the action was pending.

Apparently the 1974 June weather waited for neither man nor court and the high waters came. The controversy later went to trial in March of 1975. The Campions' suit against Simpson had been consolidated with two other cases involving the same or related problems with the river, *Park v. Simpson,* District Court No. 5329, and *Higginson v. Simpson,* District Court No. 6122.

Simpson in answering the Campions' action, in addition to generally denying averments as to liability and damages, alleged that the Campions' property, too, had been built up and enlarged by fill, which "ob-

structed the bed of the Big Wood River unlawfully and without right," and by cross-complaint alleged that by name "unknown persons, officials, or governmental entities in Blaine County, Idaho, and other persons unknown" had "unlawfully and without right artifically filled or otherwise obstructed at various points and various times the bed of Big Wood River." Blaine County was apparently served with process or voluntarily appeared in the action, filing an answer to Simpson's cross-complaint, raising five defenses, one of which was the bar of the state of limitations.

As the majority opinion points out, the controversy was tried to the court sitting without a jury. The court did not assess the total damages sustained by the Campions, but the court was not asked to do so. Here it will be noted that even in a jury trial the trial court is only required to use a special verdict form when requested to do so by any party. I.C. § 6–802.[1]

The court did not find the specific percentage of causation attributable to Simpson, but again neither party requested the court to do so. The court found fault on the part of Simpson, but also found that his actions were not the sole proximate cause

of the Campions' damages and set Simpson's share at $500.00. The court awarded a like amount of punitive damages.

The Campions moved the trial court for an additur. That motion was denied. The Campions moved to amend the findings and conclusions (which motion was denied), but did not at any time ask the court to find the Campions' total damages, or to find the individual percentages of causation assessable to all parties and/or other persons.

The amount of damages charged to Simpson obviously less than satisfied the Campions, but the trial court was not persuaded. The case is thus not unlike *Bentzinger v. McMurtrey*, 100 Idaho 273, 596 P.2d 785 (1979), and *Odziemek v. Wesely*, 102 Idaho 582, 634 P.2d 623 (1981). Nevertheless a majority of the Court, undoubtedly impressed with the damages thereafter inadvertently set by another trial judge, and in turn set aside by this Court, are of a mind that damages should be tried again. In my view, the district judge who tried the case— who is and forever has been local to the Wood River scene—heard the witnesses, found the facts, and favored the litigants with an exhaustive scholarly opinion[2] with

---

1. I.C. § 6–802 provides:

> "The court *may,* and when requested by any party shall, direct the jury to find separate special verdicts determining the amount of damages and the percentage of negligence attributable to each party; and the court shall then reduce the amount of such damages in proportion to the amount of negligence attributable to the person recovering." (Emphasis added.)

In contrast to this provision the Uniform Comparative Fault Act requires special findings to be made in all cases whether it be by the court sitting without a jury or by the jury upon instruction by the court, unless the parties agree otherwise. Section 2 of the Act, Apportionment of Damages, provides that:

> "[T]he court, unless otherwise agreed by all parties, *shall* instruct the jury to answer special interrogatories or, if there is no jury, *shall* make findings, indicating:
>
> "(1) the amount of damages each claimant would be entitled to recover if contributory fault is disregarded; and
>
> "(2) the percentage of the total fault of all of the parties to each claim . . . ."

Uniform Comparative Fault Act § 2 (emphasis added).

2. The trial court's findings of fact, apparently drawn by counsel for the Campions, were largely a breakdown by number of the district judge's Memorandum Decision. The latter was by reference incorporated into the findings and conclusions to supplement the same, and by the court declared controlling in the event of any inconsistency. The opinion, to my mind, thoroughly covered all issues of fact and of law, and should be the basis of appellate court review. Central to the court's decision was its finding based on the evidence, that channel no. 1 was not an integral part of the river. In this respect the case is almost exactly like *Heckman Ranches, Inc. v. State of Idaho,* 99 Idaho 793, 589 P.2d 540 (1979), where the trial court applied improper rules of law in establishing the line of average high water of the Salmon River near Whitebird, and accordingly found to be a river channel that which obviously was not. 99 Idaho at 801, 589 P.2d at 548 (Bistline, J., concurring).

In that case this Court unanimously affirmed that portion of the trial court's opinion noting that our holding was based on the "particular facts and circumstances presented in this case." 99 Idaho at 799, 589 P.2d at 546. One of those circumstances was the failure to ob-

an indepth review of applicable propositions of law. I am not persuaded that any reversible error was committed, and would affirm.

## APPENDIX

The above three cases were consolidated for trial and the Court finds:

1. The State did not prove any damages.

2. Defendant Simpson did not prove any damages.

3. References to channels in this decision shall be from Plaintiffs' Exhibit 3 and classified as "Channel 1," "Channel 2," and "Channel 3," as shown on said exhibit.

4. Plaintiffs Campion claim defendant Simpson blocked the entrance to channels 1 and 2; that all channels have had water flowing in them at various times in the past; and that the blocking of channels 1 and 2 caused an excess of flow in channel 3 during the spring runoff of 1974, which damages Campion.

5. The State Land Board claims Wood River at this point is navigable and that all the beds of the river up to the ordinary high-water mark belong to the State. Furthermore, it is claimed that since the water of Wood River belongs to the public, the public has an easement to flow the water in its natural course.

6. Defendant Simpson admits, in effect, that the entrances to channels 1 and 2 have been diked but said dikes were above the ordinary high-water mark and that a dike upstream and known as the "Paynter dike" caused the river to be directed at his property, making it necessary to build a dike in channel 2 to prevent flooding of his own property; that damage to Campions' property was not caused by any tortious conduct on their part. The Water Resources Board stipulated to a dismissal of its Complaint.

*The evidence is clear that:*

A. The river is a dynamic thing, which changes its own course periodically.

B. The river did in fact change its course in the area of the "Paynter dike" and the Campion home over the years.

C. That the most dramatic change occurred after construction of the dike in channel number 2.

D. Channel number 2 was an integral part of the river before the channel was filled and diked.

E. The river in this area is navigable under the legal tests which now exist as applied to the evidence.

F. The State has an easement to run the public waters of the State (Wood River) in its established channels, and owns the channel beds in channels 2 and 3 in the areas of this litigation.

G. The riparian owners along Wood River have been required to build dikes and other structures to protect their own lands from flooding.

H. Each time the natural flow of the water is disturbed upstream, the disturbance caused further disturbance downstream.

There are references in the testimony to the fact that the U.S. Corps of Army Engineers has done considerable work on Wood

ject to doubtful evidence of the line of ordinary high water. 99 Idaho at 802, 589 P.2d at 549 (Bistline, J., concurring).

As often happens, the trial court ordinarily will know a case better than anyone other than the involved attorneys. Ordinarily an appellate court will know the least. Here, to illustrate that bit of sagacity, the record indicates that there was a pretrial conference one month before the trial. Assuming it took place as scheduled, one can believe that the issues in the case were well discussed, and perhaps factual matters as well. There being no recording of such conferences, an appellate court does not even have the benefit of reading a "cold record."

All considered, it seems to me that this case, which has been a misadventure since the filing of the appeal, would be better treated on appeal were we today to follow the time-honored proposition that on an appeal from a district court decision, we should open our review on the premise that a presumption of validity attaches to the decision of the district court, and absent clearly erroneous findings or misapplication of law, that decision will be affirmed. For that reason I would adopt the memorandum decision of the district court in its entirety as set forth in the appendix.

River and that the State, Blaine County, Flood Control District, and Blaine County Planning and Zoning Commission, all claim some right and jurisdiction in the river.

It is also indicated that while the State claims title to the river bed, it assumes no responsibility to the riparian owners.

It is also apparent that a considerable amount of engineering work will have to be done to correct the problem of erosion and flood in the area of the river.

The Court cannot determine what should be done in the future. It seems this is a matter for the Land Board, the Water Resources Board, and the riparian owners, as well as other possible administrative boards to solve at an administrative level.

*The basic issues before the Court are:*

A. When the defendant blocked channels 1 and 2, was the same done in a tortious manner or without legal right?

B. Was there any damage? If so, should an abatement order issue?

The answers to the above questions are not easy and require discussion.

The law in this case seems relatively clear to the trial court. The plaintiffs claim Wood River is navigable and the blocking of the flow of the same is a nuisance which should be abated. In addition, they claim both general and punitive damages. The defense claims that the state has no jurisdiction over the lands above the high-water mark. Furthermore, since the Water Resources Board dismissed their suit with prejudice, the defendants contend it was a determination that the dike was built above the high-water mark and binding on this Court.

First, it is of little consequence that case no. 6122 was dismissed by the Idaho Department of Water Resources. While a dismissal such as this is an adjudication between those parties, it is not necessarily binding on other parties not parties to the suit. The mere fact that these cases were consolidated for trial does not avoid this general principle.

The primary question is whether the Wood River is navigable at the point or points in question. This question has been answered in the affirmative, not only because of the evidence (floating logs, tubing, fishing, etc.) but because of the applicable law.

In *Lamprey v. State* (Metcalf), 52 Minn. 181, 53 N.W. 1139, 670 (1893), the court said:

"But, if under present conditions of society, bodies of water are used for public uses other than mere commercial navigation, in its ordinary sense, we fail to see why they ought not to be held to be public waters, or navigable waters, if the old nomenclature is preferred. *Certainly, we do not see why boating or sailing for pleasure should not be considered navigation, as well as boating for mere pecuniary profit.* Many, if not most, of the meandered lakes of this state, are not adapted to, and probably never will be used to any great extent for, commercial navigation; but they are used—and as the population increases and towns and cities are built up in their vicinity, *will be still more used—by the people for sailing, rowing, fishing, fowling, bathing, skating, taking water for domestic, agricultural and even city purposes which cannot now be enumerated or even be anticipated. To hand over all these lakes to private ownership under any old narrow test of navigability, would be a great wrong upon the public for all time, the extent of which cannot, perhaps, be now even anticipated....*

"If the term, 'navigable' is not capable of a sufficiently extended meaning to preserve and protect the rights of the people to all beneficial public uses of these inland lakes, to which they are capable of being put we are not prepared to say that it would not be justifiable, within the principles of the common law, to discard the old nomenclature, and adopt the classification of public waters and private waters. But, however, that may be, we are satisfied that *so long as these lakes are capable of use for boating even for pleasure, they are navigable, within the reason* and *spirit of the common-law*

rule." (Emphasis added.) 53 N.W. at 1143.

A recent California case, *People v. Mack,* 19 Cal.App.3d 1040, 97 Cal.Rptr. 448 (1971), dealt with the issue of navigability and the court reviewed at length the decision of *Lamprey v. State, supra,* and decisions of other jurisdictions. The court, finding the river at issue in the case as navigable, supports its conclusion by the following reasons.

> ... it is extremely important that the public not be denied use of recreational water by applying the narrow and outmoded interpretation of 'navigability.'
>
> \* \* \* \* \* \*
>
> The modern tendancy in several other states, as well as here (is) to hold for use of the public any stream capable of being used for recreational purposes. \* \* \* (citing many cases from other states and citing and analizing California cases.) \* \*
>
> The failure of the Legislature to designate Fall River in the list of navigable water in Harbours and Navigation Code, sections 101–106, is of no consequence. \* \* \*
>
> The fact that the County of Shasta and the State Board of Equalization tax the bed of the river is of no significance on the question of the river's navigability. California's sovereignty and jurisdiction over navigable waters and land underneath them, makes it necessary for the federal government, in granting patents to lands riparian to such waters, to reserve such sovereign rights and hence the lack of such reservations in the patents to the lands riparian to the river is irrelevant to the issue of navigability.
>
> *The streams of California are a vital recreational resource of the state. The modern determinations of the California courts, as well as those of several of the states, as to the test of navigability can well be restated as follows: members of the public have the right to navigate and to exercise the incidents of navigation in a lawful manner at any point below highwater mark on waters of this state which are capable of being navigated by oar or motor propelled small craft.* (Emphasis added.) 97 Cal.Rptr. at 451, 453 & 454.

*Idaho Code* § 36–907 designates certain streams as navigable and sets out the test of navigability for all other streams as follows:

> "... and every other stream or part of a stream on which logs or timber can be floated to market or the place of use *during the high-water season of the year.* For the purpose of this act, logs and timber are defined as any cut timber having a diameter in excess of six (6) inches; high-water is defined as the time of year when the stream normally carries its greatest volume."

This test of navigability was expanded by the Idaho Supreme Court on July 22, 1974, when this court affirmed the decision of the trial court in *Southern Idaho Fish & Game Assoc. v. Picabo Livestock, Inc.,* 96 Idaho 360, 21 I.C.R. 102, 528 P.2d 1295 (1974). The decision enunciated what is known as the *Silver Creek Doctrine,* which is in step with the modern trend of the more liberal definition of navigability, and the court adopted the following as the test of navigability in Idaho set out by the trial court:

> Any stream which, in its natural state, will float logs or any other commercial or floatable commodity, or is capable of being navigated by oar or motor propelled small craft, for pleasure or commercial purposes, is navigable. In so holding, the trial court reasoned that in accordance with modern authorities, the basic question of navigability is simply the suitability of a particular water for public use. 528 P.2d at 1297–1298.

It is also well established that the waters of Wood River are public waters which gives rise to an easement for the natural flow of such waters.

Art. 15 § 1 of the *Idaho Constitution* states:

> § 1. Use of waters a public use.—The use of all waters now appropriated, or that may hereafter be appropriated for sale, rental or distribution; also of all

water originally appropriated for private use, but which after such appropriation has heretofore been, or may hereafter be sold, rented, or distributed, is hereby declared to be public use, and subject to the regulation and control of the state in the manner prescribed by law.

§ 42–101, *Idaho Code* states in part:

All the waters of the state when flowing in their *natural channels,* including the waters of all natural springs and lakes within the boundaries of the state, are declared to be the property of the state.

The interest of the state in its waters was tested by the Idaho Supreme Court as early as 1912 in the case of *Walbridge v. Robinson,* 22 Idaho 236, 125 P. 812 (1912) where a state engineer contended that the waters of the state are owned by the state. The court reviewed both the constitutional provision and the statute cited above and concluded:

We think it is clear that the title to the public water of the state is vested in the state for the use and benefit of all the citizens of the state under such rules and regulations as may be prescribed from time to time by the law-making power of the state. 22 Idaho at 241 [125 P. 812] It is difficult to understand how a person can be said to have property in water, light, or air, or so fixed and positive a character as to deprive the sovereign power of the right to control it for public good and general convenience. Such a right exists as to individuals, and it cannot be interfered with by them; but the state, in virtue of her right of eminent domain, has the paramount right to control and dispose of everything within her limits, which is not absolute and exclusive private property, to the promotion of the public good.

It will be found that the authorities quite uniformly class wild animals, fish, water, gas, light, and air as things of the "negative community," or the property of no one, and that they are consequently *res communes* and subject to the regulation and control of the state in its sovereign capacity. 22 Idaho at 243 [125 P. 812]

Irrespective of the ownership of the bed or channel of waters, and irrespective of their navigability, the public has the right to use public waters of this State for floating usable craft and that use may not be interfered with or curtailed by any landowner. It is also the right of the public while so lawfully floating in the State's waters to lawfully hunt or fish or do any and all other things which are not otherwise made unlawful. * * * See, also, *State v. Red River Valley Co.,* 51 N.M. 207, 182 P.2d 421 (1947).

When a party obstructs a river channel the obstruction constitutes a public nuisance which is subject to abatement.

The general rule on obstructions in navigable streams is set out in 56 Am.Jur., Waters, Sec. 218:

Navigable waters constitute public highways, and it follows, under elementary principles of the common law, that any unreasonable obstruction thereof, or of navigation thereon, is unlawful. In general, the rule is that all material obstructions to navigation not authorized by the proper governmental authority are public nuisances. It is not necessary that obstructions in the way of navigation should have actually interfered with or done it an injury in order to render such obstructions nuisances; it is sufficient if navigation was thereby rendered less convenient, secure, and expeditious. The fact that the obstruction may be a source of public benefit has been held not to relieve it of its character as a nuisance. * * *

In Idaho a nuisance is defined by two separate statutes. Idaho Code § 52–101 provides as follows:

NUISANCE DEFINED.—Anything which is injurious to health or morals, or is indecent, or offensive to the senses, or an obstruction of the free use of property, so as to interfer with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, *in the customary manner, of any navigable lake, or river, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance.* (Emphasis added.)

Idaho Code § 18–5901 provides in part as follows:

PUBLIC NUISANCE DEFINED.—Anything which . . . unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, stream, canal or basin, or any public park, square, street, or highway, is a public nuisance. [*Powell v. Springston Lumber Co.*] 12 Idaho 723, 88 P. 97 (1906).

When an encroachment or unlawful obstruction exists it is a public nuisance and subject to abatement. *Galvin v. Appleby,* 78 Idaho 457, 305 P.2d 309 (1956), Idaho Code § 18–5901, 18–5903, 52–101, 52–102, 52–205.

In the case of *Bonelli Cattle Co. v. State of Ariz.,* 414 U.S. 313, 94 S.Ct. 517, 38 L.Ed.2d 526 (1973), where the State of Arizona claimed title to the bed of an abandoned river channel, the court said:

"When the original colonies ratified the Constitution, they succeeded to the Crown's title and interest in the beds of navigable waters within their respective borders. As new states were forged out of the federal territories after the formation of the Union, they were 'admitted with the same rights, sovereignty, and jurisdiction . . . as the original States possess within their respective borders.' *Mumford v. Wardwell,* 73 U.S. (6 Wall.) 423 [18 L.Ed. 756] (1867). Accordingly, title to lands beneath navigable waters passed from the Federal Government to the new States upon their admission to the Union, under the equal footing doctrine.

\*    \*    \*    \*    \*    \*

In order for the States to guarantee full public enjoyment of their navigable watercourses, *it has been held that their title to the bed of a navigable river mechanically follows the river's gradual changes in course.* See *Oklahoma v. Texas,* 268 U.S. 252 [45 S.Ct. 497, 69 L.Ed. 937] (1925). Thus, where portions of a riparian owner's land are encroached upon by a navigable stream, under federal law, the State succeeds to title in the bed of the river to its new high-water mark.

"The Submerged Lands Act of 1953 did not disturb these doctrines or their inherent limitations. The Act merely confirmed the State's preexisting rights in the beds of the navigable waterways within their boundaries by, in effect, quitclaiming all federal claims thereto. And, consonant with the above described common-law doctrine concerning title to the bed of the river that has shifted course, the Submerged Lands Act quitclaims all federal rights to title to lands beneath the navigable streams, as 'hereafter' modified by accretion, erosion, or relection." 43 U.S.C. § 1301(a)(1). 414 U.S. at 317–318, 94 S.Ct. at 521–522. (Emphasis added.)

It appears to this Court that private citizens should not ordinarily abate such public nuisances, because, in 1967, the Idaho Legislature enacted subsection (9) of § 58–104, Idaho Code, which added to the State Board of Land Commissioners the power to "regulate and control the use or disposition of lands in the beds of navigable lakes, rivers and streams, to the natural or ordinary high-water mark thereof, so as to provide for their commercial, navigation, recreational or other public use; . . ."

The fact that private parties should not ordinarily abate public nuisances does not prevent that party from claiming damages.

A private party may maintain an action on a public nuisance if he can show that it is "specially injurious to himself." Idaho Code Section 52–204; *Redway v. Moore,* 3 Idaho 312, 29 P. 104; *Ravndal v. Northfork Placers,* 60 Idaho 305, 91 P.2d 368 (1939); *Wade v. Campbell,* 200 Cal.App.2d 54, 19 Cal.Rptr. 173 (1962). The Idaho Supreme Court has long recognized that a private person who is especially injured by the maintenance of obstructions in a navigable river may sue to abate the same. *Small v. Harrington,* 10 Idaho 499, 79 P. 461. The Supreme Court of Oregon applied this rule in *Johnson v. Jeldness,* 85 Or. 657, 167 P. 798 (1917), where the defendants were blocking the navigable waters of the Columbia River and creating a public nui-

sance. The plaintiff, an abutting owner of the river, was found to have a right to an injunction against this interference because he was injured to a greater degree than was the public generally.

It is well established in this state as well as in other jurisdictions that one party may not obstruct or divert the waters of a stream so as to damage or flood the property of another. *Boise Development Co. v. Idaho Trust and Savings Bank, Ltd., Fischer v. Davis,* 24 Idaho 36, 133 P. 916 (1913); 19 Idaho 493, 116 P. 412 (1911); *Fordham v. Northern Pac. Ry. Co.,* 30 Mont. 421, 76 P. 1040 (1904); *Kennecott Copper Corporation v. McDowell,* 100 Ariz. 276, 413 P.2d 749 (1966); *Schweiger v. Solbeck,* 191 Or. 454, 230 P.2d 195, 29 A.L.R.2d 435 (1951); *Eikland v. Casey,* 254 U.S. 652, 41 S.Ct. 149, 65 L.Ed. 458. Furthermore, these cases, when read together, clearly establish a right to both damages and injunction on appropriate facts. Indeed, the mere removal of materials from a river which causes the volume and velocity of the water in it to so increase as to overflow onto the plaintiff's land, raises a right to damages in the plaintiff. *Grant v. Kuglar,* 81 Ga. 637, 8 S.E. 878 (1888).

*Channel No. 1:*

There was some testimony that people have fished in this channel. There is also testimony that the water that did flow in this channel seeped into the ground. Some testimony revealed that the water emptied back into Wood River.

The Court cannot find under the conflicting evidence that channel no. 1 was an integral part of the river. This channel was on the land of the defendant. There was conflicting evidence as to the amount of water that flowed here or whether the flow was continuous. It is impossible to determine any ordinary high-water mark from the photographs; and since the area is now totally filled, the problem is emphasized. How could this Court order a new channel dug? What would its elevations be? What would its size be? What would its course be?

While the Court finds that channel no. 1 was blocked by the defendant, it cannot find as a matter of law that said blocking was done illegally or tortiously.

*Channel No. 2 and Damages:*

This channel did carry substantial quantities of water. This fact is clear from the photographs. It was along the westerly edge of this channel that channel no. 1 began. The plaintiffs contend that at times channel 2 had to relieve its excess water into channel no. 1. If this be true, it seems to the Court that channel no. 2 could be deepened to an extent necessary to carry that occasional flood water that may have run into channel no. 1.

There was testimony that not only did the river change its own course from time to time, but the sand and gravel bars shift with the current. It is conceivable that channel no. 1 had water either from seepage or when gravel bars shifted. By the testimony the State established that it owns the bed of the main channel of the river, up to the ordinary high-water mark. The State's property shifts with the river. The real question is whether channel 2 was an integral part of the river channel. In other words, is channel 2 a necessary extension of channel 3, which is the main river?

All the photographs show channel 2. Its location is obvious. The evidence is that channel 2 was filled with at least the consent of Simpson. Of course, when the channel was filled to such an extent that water could no longer run there, it was above the normal level of the river. Because water attempted to enter this channel, even after it was filled, the defendant built a dike on top of the fill and some twenty feet downstream from the opening of channel 2. The flood waters of '74 then washed against the dike and to such an extent that water washed out part of the island that existed between channels 2 and 3. This washing then caused the river in channel 3 to bear directly down on the Campion property. This Court cannot find, however, that the sole and proximate cause of the river change was the dike in channel 2. 1974 was one of the highest recorded flows of flood

water in Wood River. It appears quite conceivable that regardless of the dike in channel 2, the island still could have been washed away and the meandering nature of the river could have naturally been altered.

There is no evidence before this Court as to the elevation of the Campion home or the elevation of the river at the area of the dike except that the dike is upstream. Water does flow downhill. Considerable testimony revealed a large fishing and swimming hole at the Campion shore. Water would naturally seek this point, regardless of the presence of channel no. 2. While it is true that some of the water would have been in channel 2, it is sheer speculation to assume that channel 2 could have carried all of the excess flood water.

All channels that carry flood waters cannot be determined to be the property of the State. Such a ruling might encourage an ambitious bureaucrat to assert rights dating from Noah. Such flood channels that are obviously an integral part of the main river channel must be considered part of the river, however. The Court finds that channel 2 is such an integral part and should not have been filled or diked.

While there is strong evidence which indicates the defendant was engaged in a system of enlarging his land holdings, there is likewise evidence that he was protecting what he had from floods. Simpson's actions were wrong and intentional in channel 2 and constitute a public nuisance which must be abated. His actions, however, cannot be found to be the sole and proximate cause of damage to Campion, but did contribute in a nominal way to the damage. That damage is five hundred dollars ($500.00) plus punitive damages of five hundred dollars ($500.00).

The Campions are obligated as any other riparian owners to protect themselves from flood, but also have the right to the free enjoyment to their property.

*Abatement:*

Only the State can solve the problem. To send the defendant back into the river with his "cat" is not the answer. The State should exercise its ownership of the stream bed and do what is necessary to protect the riparian owners as well as the public lands and water. This Court cannot order the State to take such action, but this Court can order the State Land Board to abate the nuisance and to such an extent as to reopen channel 2 at the expense of the defendant. The expense to the defendant shall be such reasonable costs as are necessary to remove that part of the dike which will reopen channel 2 and to restore channel 2 to the original level of the river bottom in channel 2. When that amount is determined, a motion will be noticed; and upon the determination, judgment will be entered in favor of the Land Board and against the defendant. The abatement will take place before October 1, 1975, and at a time convenient to the Land Board.

Counsel for plaintiffs please prepare appropriate findings, conclusions and judgments. Please also show that the defendant's third-party complaint was bifurcated and will be set for trial when and if Simpson so requests.

SO ORDERED:

Dated this 21 day of April, 1975.

/s/ Douglas D. Kramer